**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**June 19, 2006**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellant,

v.

JON KENT RED ELK,

    Defendant - Appellee.

No. 05-6336
(W.D. Oklahoma)
(D.Ct. No. 05-CR-36-F)

_____

**ORDER AND JUDGMENT**[*]

_____

Before **HENRY**, **BRISCOE**, and **O'BRIEN**, Circuit Judges.
_____

Seven days before John Kent Red Elk's trial for the murder of his girlfriend was to begin, the government notified his attorneys it would be presenting newly discovered expert testimony. Red Elk filed a motion objecting to the admission of this testimony or, in the alternative, requesting a continuance. After a hearing, the district court granted, in part, Red Elk's motion. The government filed this interlocutory appeal claiming the district court abused its discretion in excluding a portion of its expert testimony. Exercising jurisdiction pursuant to 18 U.S.C. §

---

[*] This order and judgment is not binding precedent except under the doctrines of law of the case, _res judicata_ and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

3731,[2] we AFFIRM.

## I. Background

At approximately 5 a.m. on January 7, 2005, Red Elk called the 911 center in Lawton, Oklahoma to report his girlfriend was not breathing. Sheriff's deputies arrived at Red Elk's residence and discovered a deceased woman, Regina Dupler, laying on top of the bed in the master bedroom. After determining the residence was located on Indian land, the deputies notified the Comanche Nation Police Department, whose officers arrived on the scene shortly thereafter. In turn, they notified the Federal Bureau of Investigation (FBI). Upon her arrival at the scene, FBI Special Agent Decker interviewed Red Elk.

Initially, Red Elk stated Dupler had committed suicide. He explained he had fallen asleep on the living room couch and when he awakened, he went to the bedroom. There, he found Dupler laying on her right side on the floor by the bed. She had a plastic bag over her head, duct-taped around her neck. Her hands and feet were also duct-taped together. Red Elk stated he used his buck knife to cut

---

[2] Section 3731 allows an appeal from an order suppressing evidence in a criminal trial when the appeal is made before double jeopardy attaches. The United States Attorney must also certify to the district court that the appeal is not for the purpose of delay and the evidence is a substantial proof of fact material in the proceeding. *See United States v. Mavrokordatos,* 933 F.2d 843, 846 (10th Cir. 1991) (holding order excluding evidence as a discovery sanction was an appealable order pursuant to 18 U.S.C. § 3731). While our cases suggest we more or less accept the government's claim that the evidence is needed, the government does not have carte blanche to bring such an appeal. This case is on the margin.

the tape from her hands and legs and ripped open the bag to apply emergency resuscitation, but soon realized there was nothing he could do. Because he did not have a telephone, he immediately went to his neighbor's house to call 911. He then lifted Ms. Dupler's body onto the bed and covered her with a blanket.

Red Elk voluntarily accompanied Agent Decker to the FBI's Lawton office for further questioning. He stated he and Dupler had been living together since November 2004. Red Elk said she had been depressed because her mother committed suicide two years earlier and often talked to him about committing suicide herself. He suspected she had been drinking alcohol that day, an activity forbidden by the medication she was taking. During the interview, Agent Decker received a call informing her the emergency medical technician had established the time of death, which timing indicated Red Elk was not being truthful. After being confronted with that information, Red Elk eventually was "ready to tell what really happened." (Appx. at 37.)

He stated Ms. Dupler had often talked about suicide and asked him to help her. He denied her prior requests because he loved her. However, he knew she was in great emotional pain due to her mother's suicide and "she did not want to be in this world anymore." (Appx. at 38) He agreed to help her. According to Red Elk, Dupler taped her own feet together and put a plastic bag over her head. He stated she "had some kind of white towel, but he was not sure what she did

with it. He [thought] she may have put it in her mouth."[3] (Id.) Dupler then attempted to tape the bag around her neck, but could not get it tightly closed because the tape raveled and caught in her hair. Ms. Dupler asked Red Elk to get her another bag. While retrieving a second bag, Red Elk got a ladder and threw the first bag into the attic crawl space in the garage. When he returned to the bedroom with the second bag, he watched Dupler successfully tape it shut around her neck. He then complied with her request that he tape her hands behind her back so she could not fight. Red Elk then left the room to avoid hearing her struggle. He returned to the bedroom in the morning and the subsequent events were as he had stated earlier.

On February 16, 2005, the government indicted Red Elk with willful, deliberate, malicious and premeditated murder in violation of 18 U.S.C. §§ 1111(a) and 1153. From the outset, the parties recognized the case would be unusual because of its "expert-intensive nature." (Appx. at 229.) The court first held an *in camera* hearing with Red Elk's counsel and, a few days later, held an *in camera* hearing with Assistant United States Attorney (AUSA) McCampbell, the lead attorney for the government. The matters disclosed in these hearings made it even more obvious that expert analysis of the forensic evidence and the resulting expert opinions would be pivotal for both the prosecution and the

---

[3] Throughout the proceedings the white towel was referred to as a "towel," a "wash cloth" or a "cloth." For consistency, we will refer to it as a "towel."

defense. Given that a realistic assessment of the anticipated expert work revealed a need for additional time, the district court entered a scheduling order requiring submission of expert reports by July 1, 2005, supplemental expert reports by July 15, 2005, and *Daubert* motions[4] and responses by July 8 and July 22, 2005, respectively.

Both sides aggressively pursued pretrial investigations and filed numerous pre-trial motions. The government submitted the report of Oklahoma State Medical Examiner, Dr. Jeffrey Gofton, dated March 21, 2005. An attached chart of a female figure (routinely used in such reports) documented adhesive material on Dupler's arms, but showed no adhesive on her legs. The summary of the external autopsy examination was silent as to any fibers within Ms. Dupler's mouth. The report concluded the cause of death was asphyxiation. Dr. Gofton opined:

> It is felt that it is highly unlikely that Ms. Dupler could have taped her arms behind her back, and subsequently asphyxiated herself by placing a bag and taping it around her neck by herself. The opposite scenario of the decedent securing a plastic bag over her head and subsequently taping her arms behind her back is also extremely unlikely, if not impossible. Therefore, it is felt that the manner of death in this case is best classified as a homicide.

(Appx. at 44.)

---

[4] In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, the Supreme Court held the Federal Rules of Evidence "assign to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." 509 U.S. 579, 597 (1993).

AUSA McCampbell withdrew as attorney of record on May 2, 2005. The same day, AUSA Coats entered his appearance. Trial was scheduled for September 11, 2005. On August 10, 2005, the government sent the towel and the duct tape for testing. The materials were received at the FBI's facility in Quantico, Virginia, on August 12, 2005. The same day, the government moved for a continuance of the trial date. On August 17, 2005, the district court granted the government's motion and rescheduled trial for the October 11, 2005 trial session. Shortly thereafter, AUSA Sengel entered his appearance for the government.

After reviewing the case files, AUSA Sengel requested further testing of the towel for the presence of mucous or saliva. During the week of September 14, 2005, Julie Ann Kidd, an FBI DNA analyst, orally reported to AUSA Sengel that no blood or semen was found on the towel and tape samples. This information was consistent with her later written report. She also orally reported there was no mucous or saliva, but information about any such testing, results or conclusions was not included in her written report submitted to the government on September 21. On September 28, AUSA Sengel met with Dr. Gofton to discuss Kidd's findings. Five days after this meeting, on October 3, 2005, the government sent Red Elk notice by facsimile attaching Kidd's examination of the towel and the tape. The government's cover letter stated:

An alternate light source was used during the examination and did

not glow on the adhesive side of the tape or on either side of the towel . . . . The alternate light source did not detect any semen, saliva, mucous, or other fluids. Ms. Kidd is of the opinion that the DNA detected is probably skin cells.

Further, I anticipate that Dr. Jeffrey Gofton, the Oklahoma State Medical Examiner, will opine that the absence of adhesive or duct-tape fibers on the defendant's knife, the absence of adhesive from the victim's ankles, the apparent absence of saliva or mucous from the washcloth, and the absence of any fibers detected in the victim's mouth are inconsistent with the defendant's version of how Regina Dupler died.

(Appx. at 61.) Red Elk immediately filed a motion in limine requesting the district court to exclude this testimony or, in the alternative, grant a continuance. The government opposed this motion and objected to a continuance. The court heard argument on October 5, 2005, but reserved its ruling on the admission of testimony until after the *voir dire* of the experts.

The court reconvened on October 11, 2005, the day before trial, to allow the parties to examine Dr. Gofton regarding his proposed testimony.[5] The district court addressed four categories of testimony: 1) "the absence of . . . duct tape fibers on the knife;" 2) "the absence of adhesive on Ms. Dupler's ankles;" 3) "the absence of saliva or mucous on the towel;" and 4) "the absence of fibers in Ms. Dupler's mouth." (Appx. at 157-60.) As to the first category, the government retracted its request to question Dr. Gofton on the condition of the knife. The district court agreed Dr. Gofton's testimony on this subject would be outside his

_____

[5] Ms. Kidd was not available for examination until later in the week.

-7-

area of expertise and, in addition, he had not examined the knife. Regarding the lack of adhesive on Ms. Dupler's ankles (as opposed to finding adhesive on her arms), the district court ruled Dr. Gofton would be allowed to state his observations and his expectation, based on his experience as a pathologist, that adhesive residue would be on her legs as well if, in fact, the same duct tape used on her legs had been used on her arms. However, the court refused to let Dr. Gofton expound further on the subject.

The court excluded the third category of testimony — that the lack of saliva or mucous on the towel indicated the towel was not near her mouth when Dupler asphyxiated. The court found Dr. Gofton's proposed testimony was "based on variables sufficient to make it the subject of expert testimony, and under the schedule it simply [came] too late." However, Dr. Gofton would be allowed to testify regarding his personal observation that he detected no fibers in Ms. Dupler's mouth. The court reserved ruling on whether this testimony could be expanded to include his opinion that this observation was inconsistent with Red Elk's version of the events.

The next day, the government filed a motion for reconsideration requesting the excluded portion of Dr. Gofton's testimony be allowed in the government's case-in-chief. While the court considered the motion, jury selection was conducted. Prior to the jury being sworn, the government filed its notice of appeal, certification and request for a stay of the proceedings. Based on these

-8-

filings, the district court reluctantly dismissed the jury and stayed the case pending this interlocutory appeal.

## II. Discussion

"Rule 16(d)(2) of the Federal Rules of Criminal Procedure gives the district court broad discretion in imposing sanctions on a party who fails to comply with a discovery order." *United States v. Wicker*, 848 F.2d 1059, 1060 (10th Cir. 1988).[6] In reviewing whether a district court has abused this discretion by prohibiting the introduction of evidence, we are guided by several factors, including but not limited to: "(1) the reasons the government delayed producing the requested materials, including whether or not the government acted in bad faith when it failed to comply with the discovery order; (2) the extent of prejudice to the defendant as a result of the government's delay; and (3) the feasibility of curing the prejudice with a continuance." *Id*. at 1061. However, "these three factors [ ] merely guide the district court in its consideration of sanctions; they are not intended to dictate the bounds of the court's discretion." *Id*. Generally, "if a sanction is imposed, it should be the least severe sanction that will accomplish

---

[6] Rule 16(d)(2) provides:

If a party fails to comply with this rule, the court may:
 (A) order that party to permit the discovery or inspection; specify its time, place, and manner; and prescribe other just terms and conditions;
 (B) grant a continuance;
 (C) prohibit that party from introducing the undisclosed evidence; or
 (D) enter any other order that is just under the circumstances.

prompt and full compliance with the court's discovery orders." *Id.* at 1060

(quotations and citations omitted).

The government claims the district court failed to adequately consider and

apply the three factors enumerated in *Wicker*.[7] It maintains Dr. Gofton's

[7] The government raises several issues and sets forth arguments on appeal that were not presented to the district court. The government concedes it did not supply the relevant reports and expected testimony of Ms. Kidd and Dr. Gofton within the time designated by the pretrial order, but argues the violation of a discovery order is not equivalent to a Rule 16 violation. According to the government, the court does not have the authority under Rule 16 "to preclude the government from developing additional expert testimony prior to trial by setting a discovery deadline for expert testimony and enforcing it with the suppression sanction." (Appellant's Reply Br. at 4.) The government contends it must be a Rule 16 violation, not merely a violation of the court's scheduling order, to justify the sanction of excluding evidence. Because it did not violate Rule 16, the government concludes the district court abused its discretion in ordering exclusion of portions of Dr. Gofton's testimony.

It also bootstraps this argument into its claim it did not violate the district court's pre-trial scheduling order. The government quotes *United States v. Gowen*, for the proposition that, "Rule 16 does not require that all scientific testing be done prior to trial," but only requires prompt notice to the opposing party of pertinent evidence. 32 F.3d 1466, 1470 (10th Cir. 1994) (quotations omitted). *See United States v. Edmonson*, 962 F.2d 1535, 1546 (10th Cir. 1992). Therefore, a district court's discovery order is reasonably construed as merely directing the parties to provide expert reports by a certain date if developed prior to that time. Proceeding from that assumption, the government argues since it did not have Ms. Kidd's oral report or Dr. Gofton's resulting opinion prior to the discovery deadline, and it promptly notified Red Elk when it determined the import of the information, there was no violation of the discovery order. Neither argument was made to the district court.

The government disingenuously suggests it raised these issues twice, first in its opposition to Red Elk's motion to suppress and again in its motion for reconsideration. A careful reading of those two documents, however, reveals only one very general statement in each, with citations to *United States v. Charley*, 189 F.3d 1251, 1262 (10th Cir. 1999), *United States v. Gonzales*, 164 F.3d 1285, 1292 (10th Cir. 1999), and *United States v. Golyansky*, 291 F.3d 1245 (10th Cir. 2002). (Appx. at 67, 181) None of these cases discuss the theories argued in the government's opening appellate brief, nor were these arguments presented to the district court at the suppression hearing.

proffered testimony that the victim would have produced "copious saliva and mucous while asphyxiating" should have been allowed because (1) there was no bad faith, (2) the defense made no showing that it was prejudiced in preparing Dr. Gofton's cross-examination and (3) a short continuance would have allowed the defense to overcome any difficulty arising from the timing of the disclosure. (Appellant's Br. at 22). Contrary to the government's assertion, the district court carefully considered the *Wicker* factors in reaching its decision.

A.    Reason For Delay

The government's current theory of the case is as follows:

> The government intends to show that Red Elk staged the scene found by investigators in an attempt to hide his culpability for Ms. Dupler's murder. Red Elk claimed . . . that Ms. Dupler placed the towel in her mouth or over her face before she taped a plastic bag over her head.

---

"Vague, arguable references to a point in the district court proceedings do not preserve the issue on appeal." *Bancamerica Commercial Corp. v. Mosher Steel of Kan., Inc.*, 100 F.3d 792, 798 (10th Cir. 1996). Moreover, "where a litigant changes to a new theory on appeal or presents a theory that was discussed in a vague and ambiguous way the theory will not be considered on appeal. *Id.* at 798-99 (quotation and citation omitted); *Southern Hospitality Inc. v. Zurich Am. Ins. Co.*, 393 F.3d 1137, 1142 (10th Cir. 2004). We are not "a 'second-shot' forum . . . where secondary, back-up theories may be mounted for the first time . . . . [A]n issue must be presented to, considered and decided by the trial court before it can be raised on appeal." *Tele-Communications, Inc. v. Comm'r of Internal Revenue*, 104 F.3d 1229, 1233 (10th Cir. 1997) (internal quotations and citations omitted). It is questionable whether the government raised these arguments before the district court in even a vague or ambiguous form. Therefore, we need not consider them here.

Similarly, the government argues Dr. Gofton's opinion regarding the inferences from the absence of saliva or mucous on the towel, if excluded from its case-in-chief, should be allowed into evidence at other points in the trial. Again, this argument was not made to the district court; we decline to consider it.

-11-

At the crime scene, the towel was discovered "around her neck." Based on the expert testimony of Dr. Gofton, if that towel had been in Ms. Dupler's mouth, on her face, or even around her neck when she asphyxiated, then it would have absorbed her saliva and mucous and, according to Ms. Kidd's testimony, dried traces of those fluids would have been detected on the towel. The prosecution would use this evidence to show that the towel could not have been near Ms. Dupler's face when she asphyxiated . . . . Rather, Red Elk asphyxiated Ms. Dupler with the plastic bag he threw into the attic, and then staged a scene with the second plastic bag, the towel, and the duct tape.

(Appellant's Reply Br. at 2-3).[8]

The government argues its failure to provide the information regarding the towel to the defense was due to its ignorance of the towel's relevance at the time of the discovery deadline. It was only after AUSA Sengel became involved in the case in late August that his review of the case materials led him to request further testing by Ms. Kidd. It posits that because Rule 16 does not prohibit the government from continuing a criminal investigation once a discovery deadline passes, and the government provided reasonably prompt notification to the defense after learning of the import of the testimony to its case, there was no bad faith violation of the scheduling order justifying exclusion of the evidence.[9] *See*

---

[8] The only record of Red Elk's statements are from Agent Decker's interview notes. Her notes indicate Red Elk said Ms. Dupler "had some kind of white towel, but he was not sure what she did with it. He thinks she may have put it in her mouth." (Appx. at 38.)

[9] In footnote 3 of the government's opening brief, it explains the import of the evidence as follows:

There is no indication in the record what the victim's physical reaction

*United States v. Golyanski*, 291 F.3d 1245, 1249 (10th Cir. 2002) ("It would be a rare case where, absent bad faith, a district court should exclude evidence rather than continue the proceedings.").

In its order denying the government's motion to reconsider, the district court explained its dissatisfaction with the actions taken by the government:

> The government did not inform the court or defendant's counsel that it had initiated a new round of expert work by sending the towel and the tape to Ms. Kidd at the FBI lab on August 10. Throughout this period, the government was, of course, well aware of the importance which the court and all parties, government included, had attached to expert work and to opportunities for rebuttal or *Daubert* [ ] challenges to expert work and opinions based on that work. Not only did the government not alert the court and defense counsel to the fact that it had initiated another round of expert work (with the consequent possibility that it might be feasible to complete responsive work on an expedited basis, thus avoiding a serious scheduling dilemma), the government waited until October 3, seven days before trial, to provide even a cryptic notification to defense counsel . . . even though the government, by its own admission, had been aware of the results of Ms. Kidd's additional work . . . since

would have been if she were unconscious when the bag was taped over her head, but that scenario plainly defeats Red Elk's claim that he merely assisted her suicide. If the evidence indicated that the towel was near the victim's mouth when she suffocated, and if only an already unconscious victim would have failed to produce substantial saliva and mucous while asphyxiating, then this would be strong evidence that the victim did not herself tape the plastic bag around her head, but was unconscious when that was done by Red Elk.

(Appellant's Br. at 24, n.3.) Dr. Gofton did not offer this opinion during his *voir dire*, nor did he discuss whether saliva would be expected if the towel was not in Ms. Dupler's mouth. Prior to this appeal, the government did not advise the defense that any expert would provide an opinion on comparative volumes of saliva or mucous secreted during asphyxiation based on the consciousness of the deceased.

-13-

"sometime during the week of September 14, 2005."

(Appx. at 231.) The court noted the towel had been in the government's

possession from January through August 2005, but the government could offer no

reason why it did not send the towel for testing to the FBI lab back in January.

Indeed, "the additional expert work was undertaken only because the

government's new counsel reviewed the file long after the scheduling deadlines

had expired and perceived a new possibility for expert work." (Appx. at 241-42.)

In addition, the government did not reveal Ms. Kidd would testify that evidence

of mucous or saliva would be expected to remain detectable on the towel for eight

months until pointed questioning from the court at the October 5, 2005 hearing.

Given this scenario, the district court concluded:

A finding of bad faith, especially as to a dedicated prosecutor, is
strong medicine, to which this court will not readily resort. His acts
and omissions were obviously intentional; he has not claimed
ignorance of the scheduling order that was entered four months
before he entered his appearance. His failure to forthrightly broach
the issue at a time when it might have been resolved with no
substantial harm to either party cannot be excused - it bespeaks a
willingness to cross the line far enough to assure the frustration of
meaningful responsive efforts on behalf of the defendant. And his
withholding, until October 3 (one week before trial), of the lab report
that he had in hand on September 21 leaves very little room for a
finding that he was interested in striking hard blows but not foul
ones.

(Appx. at 246.)

The government insists that under Rule 16[10] it was not required to disclose Ms. Kidd's report until after it had spoken to Dr. Gofton and decided to use the evidence in its case-in-chief. Therefore, the district court erred in its determination regarding the timing of the government's disclosure. We disagree. "Even where Rule 16 is inapplicable, the courts have discretion to exclude evidence as a sanction for violation of a discovery order." *United States v. Gonzales*, 164 F.3d at 1291; *see also United States v. Russell,* 109 F.3d 1503, 1510 (10th Cir. 1997). There is no question that this expert report and testimony were solicited and submitted after the discovery deadline and only a few weeks before trial.

The trial court observed it was not uncommon for a lawyer who enters late in the case to wish his predecessors had done more, but throughout this case the government had been represented by veteran trial lawyers who had full access to this evidence and the FBI's forensic services. Moreover, we are not willing to say it was unreasonable for the district court to expect that late-discovered expert evidence supporting a new trial theory would be disclosed at the earliest opportunity, notwithstanding the technical requirements of Rule 16, in order to

_____

[10] Fed. R. Crim. P. 16(a)(F) provides that "the government must permit a defendant to inspect and to copy or photograph the results or reports of . . . any scientific test or experiment if . . . (iii) the item is material to preparing the defense or the government intends to use the item in its case-in-chief at trial." Rule 16(c) imposes a continuing duty to disclose additional evidence discovered prior to or during trial if the material is subject to discovery under Rule 16.

-15-

facilitate the trial schedule. Even assuming the government may not have been *certain* that Ms. Kidd's report would be material to preparing the defense, it surely knew the probability was high. We agree with the district court that, while the government may not have violated the letter of Rule 16, it certainly violated its spirit. *See Russell*, 109 F.3d at 1512 ("Prompt notification [ ] could have avoided the need for a continuance. [Counsel's] actions constituted a wholly unsatisfactory compliance with the first *Wicker* factor.").

B.     Prejudice to the Defendant

"To support a finding of prejudice, the court must determine that the delay impacted the defendant's ability to prepare or present its case." *Golyansky*, 291 F.3d at 1250. The government claims Red Elk made no showing that he was prejudiced by the timing of the disclosure of Dr. Gofton's testimony, there was no reason to believe the defense was in fact prejudiced, and the district court made no finding of such prejudice. It argues Red Elk knew since March 8, 2005, the date of Dr. Gofton's report, that Dr. Gofton would be an expert witness testifying as to Ms. Dupler's cause of death. Thus, there was more than sufficient time to prepare any challenge to his medical and forensic knowledge and little additional preparation would be needed to cross-examine him on his opinion that Ms. Dupler would have produced copious amounts of saliva while she asphyxiated. The government further asserts the district court did not rely on any showing of prejudice when it made its oral rulings and only found prejudice to the defense in

-16-

preparing a challenge to Ms. Kidd's testimony, an expert who also had been identified since May 17, 2005.

The government's argument misrepresents the court's careful consideration of this factor in its observations at the hearing and in its written order. Prior to issuing its oral ruling, the district court expressed concern as to whether Dr. Gofton's expertise encompassed the areas needed to render an expert opinion as to some of the newly-identified topics. It noted it would not "permit Dr. Gofton to expound on . . . anything that would suggest that he has any particular expertise beyond that which he clearly professes to have." (Appx. at 159-60.) In its written order, the court specifically addressed the prejudice to the defense, phrasing the issue as follows:

> The government [ ] put the defendant in the position, a week before trial, of contending with a newly-disclosed hypothesis, premised on new expert work, that if the defendant had acted as he claimed he had, Ms. Dupler's saliva and mucous would have been detectable on the towel eight months after the fluids were deposited on the towel.

(Appx. at 240-41.) The court recognized that competent defense counsel, at a minimum, would need time to ascertain the "methodology, factual accuracy and significance of the 'alternate light source' tests" and the handling of the towel while it was in the FBI's possession for eight months, possibly being touched by personnel unaware the towel would later be tested for the presence of any substance. The court concluded the late disclosure "effectively preclude[d] meaningful efforts by defense counsel to test the technical merit of the new expert

-17-

testimony or to marshal the resources necessary to challenge the . . . testimony either by way of a *Daubert* [ ] challenge or by way of rebuttal at trial." (Appx. at 247.) We find nothing in the facts to rebut the court's conclusion. Contrary to the government's assertions, the prejudice to Red Elk's case went beyond merely needing a few days to prepare questions for cross-examination.

C.     Choice of Sanction

Although the government initially opposed a continuance, it requested that remedy as an alternative in its motion to reconsider. It is the government's position that a short continuance would have cured any prejudice. While a continuance is the "preferred sanction," the court has broad discretion whether or not to grant one. *Golyansky*, 291 F.3d at 1249. "The trial judge is in the best position to evaluate the effect of [ ] new evidence and determine the appropriate course of action." *United States v. Edmonson*, 962 F.2d 1535, 1549 (10th Cir. 1992).

The court considered the effect of its limitation on Dr. Gofton's testimony, commenting: "There should be no misapprehension that the government's case would stand or fall with the admissibility of this hypothesis. [It is] but one of numerous arrows in the government's quiver - - not the least of which is the fact that the defendant does not deny that he helped kill Regina Dupler . . . ." (Appx. at 241, n. 10.) It also considered the fact it was excluding only a portion of Dr. Gofton's testimony, while allowing him to opine on his personal observations

made during his examination including the absence of adhesive on Ms. Dupler's ankles and the absence of fibers in her mouth.

In *United States v. Wicker*, we affirmed the district court's decision to exclude testimony and a lab report due to late disclosure. 848 F.2d at 1060, 1062. Here, the court found the facts in *Wicker* were materially indistinguishable from the facts before it, noting the prior efforts by the court to guarantee prompt and complete discovery, the interest in maintaining the integrity and schedule of the court, and the court's "inherent power to control and supervise its own proceedings." (Appx. at 243 (quoting *Wicker*, 848 F.2d at 1061)). As we stated in *Russell*, "*Wicker*'s admonition that the trial court must impose the least severe sanction that will accomplish prompt and full compliance with the court's discovery orders does not mean that a continuance is necessary just because it will cure the prejudice . . . . A remedy that does not maintain [the court's] integrity and schedule does not accomplish prompt and full compliance with the court's discovery orders." *Russell*, 109 F.3d at 1512 (internal citations and quotations omitted). In light of the district court's careful consideration of the relevant factors and our review of the record, we hold the court did not abuse its discretion in suppressing portions of Dr. Gofton's testimony.

**AFFIRMED**.

Entered by the Court:


**Terrence L. O'Brien**
United States Circuit Judge