ORDER AND JUDGMENT *
CAROLYN B. McHUGH, Circuit Judge.
I. INTRODUCTION
Gavin Yepa is accused of killing Lynette Becenti during a brutal sexual assault. A week before his scheduled trial, and almost three months after the deadline for the exchange of exhibit lists, the government amended its exhibit list to include a 911 recording of a call from Ms. Becenti’s cell phone allegedly made while she was being sexually assaulted. As a sanction for the government’s failure to comply with the court’s scheduling order, the district court excluded the call. On a prior interlocutory appeal, a panel of this court reversed and remanded for the district court to select a discovery sanction using the framework we outlined in United States v. Wicker, 848 F.2d 1059 (10th Cir.1988). See United States v. Yepa, 572 Fed.Appx. 577, 587 (10th Cir.2014) (unpublished).
On remand, the district court conducted an evidentiary hearing, considered the factors identified in Wicker, and again exelud- *674 ed the recording. The government then filed this appeal and argues the district court abused its discretion by excluding the evidence rather than granting a continuance. We affirm.
II. BACKGROUND

A. Factual History

Ms. Becenti was gruesomely murdered on December 28, 2011, in Mr. Yepa’s home. United States v. Yepa, 572 Fed.Appx. 577, 578 (10th Cir.2014). An autopsy concluded that her death resulted from being penetrated vaginally with the handle of a shovel. Id. The government indicted Mr. Yepa for the murder.
Based on the pretrial record, the government anticipates the evidence will show that Mr. Yepa and two friends picked up Ms. Becenti as she was walking along a road at night. Id. The two friends drove Mr. Yepa and Ms. Becenti, who had already been drinking heavily, to a liquor store in San Ysidro, New Mexico, where Mr. Yepa purchased a bottle of vodka. Id. They then dropped Ms. Becenti and Mr. Yepa at Mr. Yepa’s house in Jemez Pueblo between 8:30 and 9:00 p.m. and left. Id. Another of Mr. Yepa’s friends, Rodney Adams, arrived at Mr. Yepa’s house between 9:45 and 10:00 p.m. and later told police that he witnessed Mr. Yepa sexually assaulting Ms. Becenti. Id. Rather than intervening, Mr. Adams stole Ms. Becenti’s cellular telephone from her backpack and léft.
Later that evening, at about 11:50 p.m., Mr. Yepa flagged down Jemez Pueblo' tribal officials and told them a woman was in his house, she was not breathing, and that he had brought her home hoping to have sex with her. Id. The tribal officials observed a large amount of blood in Mr. Yepa’s home, extending from the master bedroom, across the living room and into another bedroom. Id. Ms. Becenti’s nude body was found covered with blood; a shovel was found near her body and the first fifteen inches of its handle was coated with blood. Id. Mr. Yepa’s clothing was stained with blood and blood was imbedded around his fingernails and toenails. Id.
The investigation later uncovered another piece of evidence which became the subject of this appeal: a recording from the Sandoval County Emergency Dispatch System of a 911 call received from Ms. Becenti’s cell phone, possibly made while she was being sexually assaulted. Id. at 579. The call occurred sometime between 9:10 p.m. and 9:30 p.m. on the evening of December 28, 2011.[1]
The 911 call was automatically recorded by the Sandoval County Regional Emergency Communications Center (“SCRECC”). In it, an obviously intoxicated female caller asks for assistance. But the caller is unable to identify herself, the location from which she is calling, or the nature of her emergency. A male can be heard talking in the background during the call, but. the caller could not identify him. And when the 911 operator asked her to put the male on the phone, the caller became angry, inquiring ‘You want to talk to the f — ing motherf — er that is f — ing me?” The woman can also be heard pleading with the man, saying “please don’t do that to me.” According to government witnesses, the caller was Ms. Becenti, and the male voice belongs to Mr. Yepa.

*675
B. Procedural History

1. The Discovery of the Cell Phone
After Mr. Yepa' first contacted Jemez Pueblo tribal officials on the night of Ms. Becenti’s death, the Jemez Pueblo Police Department (JPPD) responded and secured the crime scene. JPPD Chief Mike Toya contacted the FBI. An FBI Evidence Recovery Team, led by Special Agent Ben Bourgeois, arrived on scene shortly after 2:00 a.m. the morning of December 29, 2011.
The day after the murder, December 29, the JPPD identified three relevant 911 calls made to the SCRECC on the evening of December 28 and provided Agent Bourgeois -with printed copies of the Computer Assisted Dispatch (CAD) reports of the three calls. The- second CAD report was the report of the 911 call at issue in this case, and included the caller’s phone number but not the caller’s name. Agent Bourgeois did not consider the CAD reports to be a priority, and he did not ask why the JPPD associated these CAD reports with the homicide. Agent Bourgeois filed the CAD reports and then apparently forgot about them for some time.
The evening of December 29, 2011, Mr. Adams appeared at the JPPD in an intoxicated and unstable condition. He was arrested after a confrontational encounter with JPPD Officer Gary Tafoya. While receiving medical care for an injury Mr. Adams suffered during the arrest, Mr. Adams made a statement to Officer Tafoya about the evening of December 28, 2011. He claimed to have witnessed a sexual assault by Mr. Yepa, admitted that he took the victim’s cell phone from her bag, and told Officer Tafoya that he later abandoned the phone at a gas station.
Early the morning of December 30, Officer Tafoya went with Officer Jordan Shen-do to the location described by Mr. Adams to search for the phone. They retrieved the phone, and Officer Tafoya informed Chief Toya that it had been found.
During his next shift, Officer Tafoya prepared two reports. The first described his altercation with Mr. Adams, and a supplemental report summarized Mr. Adams’s statement and the recovery of the cell phone. The supplemental report was tagged with an identification’number associated with the homicide. Officer Tafoya then logged the cell phone and a recording of Mr. Adams’s statement into evidence and placed them in an evidence locker. The evidence forms for both referenced the homicide’s identification number. Officer Tafoya placed both reports and copies of the evidence forms in Chief Toya’s in-box.
Chief Toya apparently reviewed the report relating to Mr. Adams’s arrest but did not read the supplemental report. Both reports were then filed together in a file not related to the homicide.
On December 30, 2011, FBI Agent Bourgeois executed an affidavit in support of a criminal complaint against Mr. Yepa. The affidavit indicates that Mr. Adams stole Ms. Becenti’s cell phone and that JPPD was attempting to recover the phone. Agent Bourgeois may have learned about the phone from Chief Toya, at a time before Chief Toya learned the phone had been recovered.
Mr. Yepa was charged on December 30, 2011, and a grand jury returned an indictment against him on January 28, 2012. Meanwhile, the JPPD retained custody of Ms. Becenti’s cell phone.
The JPPD is a small police department with a single evidence room. As a practical matter, one individual, C.I. Soto, was responsible for tracking evidence during the investigation into Ms. Becenti’s murder. On January 2, 2012, C.I. Soto logged the *676 cell phone into the evidence room under the identification number for the homicide. Based on that information, C.I. Soto would have been able to produce Ms. Becenti’s cell phone in response to a request for it made any time subsequent to January 2, 2012.
At some point, likely around January 4, 2012, Agent Bourgeois asked Chief Toya for “any items related to the homicide in his custody or in their administrative files or anything like that.”[2] C.I. Soto produced a mixed bundle of documents, including documents related to the tribal charges against Mr. Adams and documents related to the homicide. The JPPD did not produce the cell phone at that time.
2. Connecting the Cell Phone and Recording to this Case
The district court set the case for trial on April 4, 2012. The court’s initial instructions required disclosure of exhibit lists thirteen days prior to trial. The case was later designated complex and the trial was continued multiple times. The district court’s third scheduling order set the trial for August 14, 2018, and required an exchange of exhibit lists by May 15, 2018, three months before trial. The United States filed a timely exhibit list on May 15, 2013.
It took nearly a year and a half for the prosecution to follow up on the cell phone and 911 recording. In June of 2013, while in final trial preparation, Assistant United States Attorney Mark Baker and Agent Bourgeois reviewed a recording of the 911 call and the corresponding CAD report. Neither immediately connected it to this case. The prosecution then provided the recording and CAD report to the defense on June 20, 2013, but did not indicate that it intended to use either at trial. However, AUSA Baker requested that Agent Bourgeois determine whether the phone number referenced in the CAD report tied back to the homicide.
Agent Bourgeois did not act on AUSA Baker’s request. Because the call appeared to come from a location a few miles away from the homicide, involved an intoxicated, belligerent woman, and prompted only a welfare check by the JPPD, Agent Bourgeois assumed the call had no significance to the murder investigation. Agent Bourgeois could have used the 911 caller’s phone number to determine the caller’s service provider, and from there presumably identified the caller, but he did not do so.
On July 31, 2013, Agent Bourgeois and two prosecutors traveled to the Santa Ana Pueblo Police Department to interview one of the tribal officials who initially discovered Ms. Becenti’s body and reported the homicide. Coincidently, Officer Tafoya had previously left the JPPD and joined the Santa Ana Pueblo,Police Department. Officer Tafoya’s new office was close enough to the interview room that he overheard parts of the interview and realized it concerned Ms. Becenti’s homicide. Officer Tafoya introduced himself, and told Agent Bourgeois and the prosecutors about Mr. Adams’s statement and that Ms. Becenti’s cell phone had been recovered.
Later that same day, Agent Bourgeois phoned the JPPD to request anything connected to Mr. Adams, and the agent and prosecutors drove to the JPPD. When they arrived, C.I. Soto produced the cell phone *677 and various documents related to Officer Tafoya’s reports.
Between August 1 and August 5, 2013, Agent Bourgeois found a charger for the cell phone, charged it, and scrolled through the phone’s call log. He learned the phone had called 911 on the evening of December 28, 2011, and notified the prosecution of his discovery.
On August 7, 2013 — a week after obtaining the cell phone from the JPPD and a week prior to the scheduled trial date of August 14 — Agent Bourgeois asked another FBI agent, Agent Leroy Chavez, to download information from the cell phone. Agent Chavez was unable to do so, but took photos of the cell phone’s screen. The phone’s call log showed a 911 call at 9:10 pm on December 28, 2011 — the date and approximate time of the murder. Agent Bourgeois again informed the prosecution.
That same day, AUSA Baker contacted defense counsel to provide notice that the United States intended to introduce the 911 recording at trial. The prosecution also filed a Third Amended Exhibit List that day, which included the 911 recording.
3. Exclusion of the Call
On August 8, 2013, Mr. Yepa moved to exclude the 911 call as a sanction for the government’s violation of the scheduling order.[3] The district court granted his motion. Following an interlocutory appeal, this court reversed because the district court had applied the wrong legal standard in choosing the appropriate sanction. United States v. Yepa, 572 Fed.Appx. 577, 587 (10th Cir.2014). We remanded with instructions to apply the correct legal framework.
On remand, the district court conducted an evidentiary hearing to investigate the reasons for the government’s untimely addition of the 911 call to its exhibit list. After the hearing, the district court entered a detailed order in which it again excluded the 911 recording. We have jurisdiction over the government’s interlocutory appeal challenging that decision under 18 U.S.C. § 3731.
III. DISCUSSION

A. Standard of Review

We review the district court’s decision to exclude evidence as a sanction for discovery violations for abuse of discretion. United States v. Banks, 761 F.3d 1163, 1196 (10th Cir.2014). But we review the district court’s findings of fact for clear error. United States v. Gonzales, 164 F.3d 1285, 1289 (10th Cir.1999).

B. Analysis

There are three principal factors that a district court should consider in determining the appropriate sanction for violating a scheduling order: (1) the reason for the delay, including whether the non-compliant party acted in bad faith;. (2) the extent of prejudice to the other party; and (3) “the feasibility of curing the prejudice with a continuance.” United States v. Wicker, 848 F.2d 1059, 1061 (10th Cir.1988). But these “three factors merely guide the district court and do not dictate the bounds of the court’s discretion.” United States v. Russell, 109 F.3d 1503, 1511 (10th Cir.1997). And while “[t]he court should impose the least severe sanction that will accomplish prompt and full compliance *678 with the discovery order,” United States v. Gonzales, 164 F.3d 1285, 1292 (10th Cir.1999), in some circumstances a district court may “suppress evidence that did not comply with discovery orders to maintain the integrity and schedule of the court even though the [party entitled to the disclosure] may not be prejudiced” Wicker, 848 F.2d at 1061. This is because our admonition that a continuance is preferred “does not mean that a continuance is necessary just because it will cure the prejudice.” Russell, 109 F.3d at 1512.
Regarding the first factor we identified in Wicker, exclusion is ordinarily only appropriate where a party acts in bad faith or lacks any legitimate reason for a delay. See Banks, 761 F.3d at 1199; United States v. Golyansky, 291 F.3d 1245, 1250 (10th Cir.2002); United States v. Adams, 271 F.3d 1236, 1244 (10th Cir.2001); Gonzales, 164 F.3d at 1292; United States v. Red Elk, 185 Fed.Appx. 716, 721-23 (10th Cir.2006) (unpublished).[4] But our case law also establishes that negligence alone can justify excluding evidence. For instance, in Wicker the prosecution made a single request that an expert mail a report to the defense and then failed to follow up, resulting in the report being disclosed to the defense only a few days before trial. 848 F.2d at 1060-62. Although the prosecution’s oversight was merely negligent, we affirmed the district court’s exclusion of the expert’s testimony based on the impact a continuance would have had on the court’s schedule and on the jurors, who had already been empaneled. Id. at 1062. See also Red Elk, 185 Fed.Appx. at 723-25 (affirming trial court’s exclusion of expert testimony where government’s negligence in following up with expert resulted in expert’s report being provided to defense well after the discovery deadline).
We agree with the district court that the government’s negligence here is similar to that in Wicker:[5] The prosecution and the FBI took a careful look at the CAD reports and 911 calls only after the expiration of the discovery deadlines. Before then, Agent Bourgeois made a single request for relevant evidence from the JPPD, even though he was aware the JPPD searched for the victim’s cell phone as early as December 30, 2011. And Agent Bourgeois did not follow up with the JPPD or comply with AUSA Baker’s June 2013 instruction to determine whether the CAD report and 911 call were connected to Ms. Becenti’s murder. In turn, AUSA Baker did not check back with Agent Bourgeois to assure that this had been done. Even after Agent Bourgeois and AUSA Baker obtained the cell phone, they failed to review its contents for a week. As a result, the defense first learned of the prosecution’s intention to introduce the 911 recording only one week before trial. *679 Considering these facts, the district court found the government did not act in bad faith. But it concluded the government acted negligently and thus did not have a legitimate reason for the delay in designating the 911 recording on its exhibit list.[6]
Next, Wicker directs courts to consider the prejudice the delay caused to the other party. Typically, prejudice requires that a delay impact the defendant’s ability to prepare or present his case. Golyansky, 291 F.3d at 1250; see United States v. Ivy, 83 F.3d 1266, 1280 (10th Cir.1996). The district court found that Mr. Yepa could not adequately prepare for trial given the government’s late designation of the 911 recording. We cannot conclude the district court clearly erred in finding that Mr. Yepa would need additional time to alter his trial strategy to account for the 911 recording and that Mr. Yepa would have had to allocate trial preparation resources to challenge the admission and substance of the recording.
The third Wicker factor asks whether a continuance is feasible and can cure the prejudice to a defendant. As discussed in our prior ruling in this case, absent bad faith or a trial already in progress, a continuance is typically the appropriate remedy. Yepa, 572 Fed.Appx. at 586; see United Stales v. Combs, 267 F.3d 1167, 1179 (10th Cir.2001); United States v. Nichols, 169 F.3d 1255, 1268 (10th Cir.1999); Russell, 109 F.3d at 1510-12. To say that a continuance is typically appropriate, however, must mean that exclusion is permissible in some circumstances. See Adams, 271 F.3d at 1243-44; Wicker, 848 F.2d at 1061; Red Elk, 185 Fed.Appx. at 723-25. Thus, even when a continuance is possible, the district court may consider the impact of a continuance on the court’s calendar, on the jurors, on the integrity of a court’s orders, and whether a continuance might create other problems. Wicker, 848 F.2d at 1061; Red Elk, 185 Fed.Appx. at 725.
Here, the district court determined that a continuance of four to eight weeks would be necessary to allow Mr. Yepa to prepare for trial if the 911 call was admitted.[7] It then noted the disruptive impact such a delay would have on the court’s schedule and that of a visiting judge, who had agreed to preside over Mr. Yepa’s trial. And the district court expressed concern about the inconvenience a continuance would cause to the jurors, who had been summoned but not yet empaneled. The inconvenience to jurors who have actually been selected, as in Wicker, is undeniably greater than the inconvenience to the jurors here, who had only been summoned.' But nothing in our prior decisions precludes a district court from weighing that *680 admittedly lessor inconvenience in selecting an appropriate discovery sanction. See Wicker, 848 F.2d at 1061 (noting that the three identified factors “are not intended to dictate the bounds of the court’s discretion”).
Thus, the district court considered each of the three factors specifically identified in Wicker. In addition, consistent with our acknowledgement in Russell that the Wicker factors do not delineate the outer bounds of the analysis, 109 F.3d at 1511, the district court concluded that a four to eight week continuance would inequitably extend Mr. Yepa’s pretrial incarceration. As of the date of the initial hearing on the motion to exclude the 911 recording, Mr. Yepa had been confined without bail for 592 days, from December 29, 2011, to August 11, 2013. The district court reasoned that the government’s late disclosure would effectively force Mr. Yepa to choose between having a fair trial after a continuance in which the defense could prepare for the introduction of the 911 recording, and avoiding six to eight weeks of additional pretrial incarceration but being unable to respond effectively to the 911 call.[8] The district court did not abuse its discretion by considering, in conjunction with the Wicker factors, the impact of a continuance on the length of Mr. Yepa’s pre-trial incarceration.
Other concerns highlighted by our precedent also support the conclusion the district court acted within its discretion. First, excluding the recording will not preclude a just adjudication of this case. Red Elk, 185 Fed-Appx. at 724. To some extent, the 911 recording corroborates Mr. Adams’s statements,[9] and it may have had a powerful emotional impact on the jury. But even without the recording, the government has substantial evidence against Mr. Yepa including: testimony from Mr. Yepa’s friends that they dropped Ms. Be-centi at Mr. Yepa’s home shortly before the estimated time of the murder; Mr. Adams’s eyewitness account of the sexual assault; the blood and murder weapon found in Mr. Yepa’s home, the blood on Mr. Yepa’s person, and forensic evidence from the crime scene in the nature of fingerprint, serological, and DNA evidence.
Although we have identified a continuance as the preferred sanction in the absence of bad faith, we have not removed all discretion from the trial court. Rather, “[ejven in the absence of prejudice, integrity and scheduling considerations alone may justify suppression of otherwise admissible evidence offered by the delinquent party.” Russell, 109 F.3d at 1511. Here, by the time the government amended its exhibit list to include the 911 recording, jurors had been summoned for the upcoming trial, the court and its staff had devoted considerable effort to prepare for *681 trial, and a visiting judge from the District of Wyoming had arranged to travel to New Mexico to preside over the case. The district court carefully considered these facts and the factors we identified in Wicker before ruling the government could not introduce the 911 recording at trial. Our preference for a continuance remains, but we cannot conclude the district court exceeded its discretion by instead excluding the 911 recording. See United States v. Sims, 776 F.3d 583, 586 (8th Cir.2015) (“Though the district court did not have to remedy the situation by excluding the evidence and could have imposed an alternative sanction, the court had discretion to impose the sanction it did.”).
Finally, the government argues that Supreme Court cases decided since Wicker call our analysis into question, because they state that the exclusion of evidence is disfavored except to deter government misconduct. See, e.g., Herring v. United States, 555 U.S. 135, 141, 129 S.Ct. 695, 172 L.Ed.2d 496 (2009). But these exclusionary rule decisions are not analogous. The link between misconduct and exclusion is appropriate in Fourth Amendment cases because, by virtue of an unconstitutional search or seizure, the defendant’s Fourth Amendment rights have already been violated. In that context, the court excludes the wrongfully obtained evidence to deter future misconduct. Id. But when crafting a discovery sanction, a district court can still remedy the harm caused by noncompliance with the court’s discovery order both with respect to the injury to the other party and as to the court’s own interests. Combs, 267 F.3d at 1179; Nichols, 169 F.3d at 1268-69; Wicker, 848 F.2d at 1061. Accordingly, we reject the government’s assertion that the sanction of exclusion may be imposed in this context only in response to misconduct.[10]
IY. CONCLUSION
For the foregoing reasons, we AFFIRM the district court’s exclusion of the 911 recording and REMAND for further proceedings.

 This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive val,ue consistent with Fed. R.App. P. 32.1 and 10th Cir. R. 32.1.

. The precise time of the 911 call is not clear from the record. A report prepared by Sandoval County Regional Emergency Communications Center indicates the call occurred at approximately 9:23 p.m. However, the cell phone's call log shows an outbound 911 phone call placed at 9:10 p.m.

. The prosecution initially represented to the district court that the FBI had made “repeated” requests to the JPPD for information or evidence related to the homicide, and that the cell phone had been incorrectly tagged. After the evidentiary hearing on remand, the district court concluded that neither of these representations was true.

. Mr. Yepa provided alternative grounds for excluding the 911 call, relying on the Confrontation Clause and Rule 403, and arguing the government could not provide foundation for the recording. These claims are not before us on appeal, and therefore we do not address them further.

. Though not precedential, we find the reasoning of this court’s unpublished opinions instructive. See 10th Cir. R. 32.1 ("Unpublished opinions are not precedential, but may be cited for their persuasive value.”).

. The government has not asked us to determine the precise scope of the “government” for purposes of assessing responsibility for the delay in identifying the 911 recording as a trial exhibit. Compare Smith v. Sec'y of N.M. Dep’t of Corrections, 50 F.3d 801, 824 (10th Cir.1995) (holding that for the purposes of discovery obligations under Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the. "prosecution” includes the prosecutor’s entire office, law enforcement personnel, and other arms of the state involved in the investigation), and United States v. Beers, 189 F.3d 1297, 1304 (10th Cir.1999) (holding that while material in the possession of federal investigating officers can be imputed to federal prosecutors for Brady purposes, material in state officials’ possession cannot), ■with United States v. Wicker, 848 F.2d 1059, 1062 (10th Cir.1988) (distinguishing between the government and an- expert employed by the prosecution).

. The government’s opening brief does not challenge the district court’s conclusion on this point. To the extent the government's reply brief can be read to argue the district court clearly erred by faulting Agent Bourgeois or AUSA Baker, the government waived these arguments by raising them for the first time on appeal in a reply brief. United States v. Pablo, 696 F.3d 1280, 1299 n. 21 (10th Cir.2012).

. We reject the government’s argument that because Mr. Yepa initially stipulated to a scheduling order providing for designation of exhibits four weeks prior to trial, a four week continuance would have been sufficient. We review questions of fact for clear error. United States v. Gonzales, 164 F.3d 1285, 1289 (10th Cir.1999). It was not clearly erroneous for the district court to conclude that more preparation might be required than contemplated in the parties’ initial stipulated scheduling order where this case was designated complex, the district court repeatedly entered ’scheduling orders providing for disclosure of exhibits more than a month prior to trial, the parties produced a substantial amount of evidence after the initial scheduling order was entered, and the court concluded the 911 recording required the defense to reassess its trial strategy.

. Although the decision to exclude the evidence has, in fact, caused Mr. Yepa to endure many more than eight weeks of pretrial incarceration during the pendency of the interlocutory appeals of that decision, we have never required the district courts to anticipate the parties’ responses to rulings in choosing an appropriate sanction. For example, in concluding that the district court did not exceed its discretion by excluding the evidence in Wicker, we considered the facts and circumstances as of the time the district court entered its order, without the benefit of hindsight. United States v. Wicker, 848 F.2d 1059, 1062 (10th Cir.1988).

. Notably, the 911 recording also calls into question certain aspects of Mr. Adams's statement to police. As the district court noted, "[Mr.] Adams’s statement that he found [Ms. Becenti’s] cellphone in her purse or bag presents the perplexing question of how [Ms. Be-centi's] cellphone found its way into [her] purse or bag following the sexual assault captured in the recording of the 9:23 p.m. 911 call.”

. Relying on United States v. Ivy, 83 F.3d 1266 (10th Cir.1996), the government also argues that Mr. Yepa's opposition to a continuance precluded him from seeking exclusion of the evidence. But the government misapprehends the general rule that a defendant who does not request a continuance may not be heard to complain on appeal that he suffered prejudice as a result of late-arriving discovery. The principle does not apply where a district court excludes evidence, because a defendant in those circumstances has no need to seek a continuance. United States v. Davis, 244 F.3d 666, 672 (8th Cir.2001).