**UNITED STATES COURT OF APPEALS**

**TENET CIRCUIT**

UNITED STATES OF AMERICA,

Plaintiff - Appellant,

v.

GAVIN YEPA,

Defendant - Appellee.

No. 13-2149
(D.C. No. 1:12-CR-00163-MCA-1)
(D. N.M.)

**ORDER AND JUDGMENT**[*]

Before **KELLY**, **O'BRIEN**, and **MATHESON**, Circuit Judges.

Gavin Yepa was charged with killing Lynette Becenti during a sexual assault.[1]  A

week before his scheduled trial and almost three months after the deadline for the

exchange of exhibit lists, the government amended its exhibit list to include a 911

recording of a call from Becenti's cell phone allegedly made while she was being

---

[*] This order and judgment is an unpublished decision, not binding precedent. 10th
Cir. R. 32.1(A).  Citation to unpublished decisions is not prohibited.  Fed. R. App. 32.1.
It is appropriate as it relates to law of the case, issue preclusion and claim preclusion.
Unpublished decisions may also be cited for their persuasive value.  10th Cir. R. 32.1(A).
Citation to an order and judgment must be accompanied by an appropriate parenthetical
notation – (unpublished).  *Id.*

[1] Yepa is an enrolled member of the Jemez Indian Tribe; Becenti was an enrolled
member of the Navajo Indian Tribe.

sexually assaulted. Yepa moved to exclude the recording as a sanction for the government's failure to comply with the established deadlines. The motion was based on the factors articulated in *United States v. Wicker*, 848 F.2d 1059 (10th Cir. 1988). The district judge granted the motion, but instead of relying on *Wicker*, she determined exclusion was proper because the government had not shown excusable neglect under Rule 45(b)(1)(B) of the Federal Rules of Criminal Procedure (Rule 45). The government filed this interlocutory appeal claiming the judge abused her discretion in excluding the 911 recording.[2] Because the judge failed to make an adequate record, we **REVERSE** and **REMAND**.

## I. BACKGROUND

Becenti was gruesomely murdered on December 28, 2011. Her death resulted from being sexually assaulted with the handle of a shovel,[3] among other objects. The government indicted Yepa for the murder. Based on the pretrial record, the government's anticipated evidence is that Yepa and two friends picked up Becenti as she was walking down the road; Becenti, who was drinking from a can of a highly alcoholic beverage called Four Loco, told Yepa she had been in a fight with her husband earlier in the

---

[2] Our jurisdiction derives from 18 U.S.C. § 3731, which allows an appeal from an order suppressing evidence in a criminal trial when the appeal is made before jeopardy attaches. In taking such an appeal, the United States Attorney must certify to the district court that "the appeal is not taken for purpose of delay and that the evidence is a substantial proof of a fact material in the proceeding." 18 U.S.C. § 3731. The required certification was made.

[3] The autopsy results showed Becenti died from excessive internal hemorrhaging, caused by approximately fifteen inches of vaginal penetration with a foreign object. The penetration extended from the vagina to the diaphragm.

evening; Yepa told Becenti she should go home with him because he would treat her better than her husband; the two friends drove Yepa and Becenti to a liquor store in San Ysidro, New Mexico, where Yepa purchased a bottle of vodka; the two friends dropped Becenti and Yepa off at Yepa's house in Jemez Pueblo between 8:30 and 9:00 p.m. and then left;[4] Yepa's friend, Rodney Adams, arrived at Yepa's house around 9:45 to 10:00 p.m. and witnessed Yepa insert a water bottle into Becenti's vagina, remove it, and drink from it;[5] at about 11:50 p.m., Yepa, who appeared to be intoxicated, flagged down Jemez Pueblo tribal officials telling them a woman was in his house, she was not breathing, and he had brought her to his house hoping to have sex with her; the tribal officials observed a large amount of blood in Yepa's home, extending from the master bedroom, across the living room and into another bedroom; Becenti's nude body was found covered with blood; a shovel was found near her body, the first fifteen inches of its handle was coated with blood; FBI agents uncovered a plastic water bottle and a bottle of vodka (both coated in blood) from the home (the Jemez Pueblo Police Department (JPPD) also participated in the investigation); and Yepa's clothing was stained with blood and blood was imbedded around his fingernails and toenails.[6] Another piece of evidence is the

---

[4] Although the criminal complaint states Yepa and Becenti were dropped off at Yepa's house at 10 p.m., the government claims the two friends will testify they dropped them off between 8:30 and 9:00 p.m. and no one else was at the house.

[5] According to Adams's statement, after witnessing the sexual assault, he rummaged through Becenti's purse, removed her cell phone, and left with it.

[6] The government performed DNA and serology testing on various items from the scene including the water bottle, vodka bottle, shovel and swabs of Yepa's hands and

(Continued . . . )

subject of this appeal: a recording from the Sandoval County Emergency Dispatch System of a 911 call received from Becenti's cell phone, possibly made while she was being sexually assaulted.[7]

The government did not learn of this recording until sometime in June 2013, approximately two months before the scheduled trial date (August 14, 2013) and about a month after its trial exhibit list was due (May 15, 2013).[8] At some point the lead prosecutor asked the FBI to obtain the 911 recordings from the night of the murder.[9] It is unclear why the decision was made to obtain the 911 recordings from that evening or

---

feet. According to the government, the results showed: (1) Adams was excluded as a donor to the DNA present on the water bottle; Yepa and Becenti were not; (2) Adams was excluded as a donor to the bloodstain taken from the vodka bottle; Becenti was a major contributor; and (3) Adams was excluded as a donor to the bloodstain on the shovel, Becenti was a donor, and Yepa was a possible contributor. The results of the DNA testing on the swabs of Yepa's hands and feet are not in the record.

[7] We say "possibly" because neither the female caller nor the male heard in the background is identified on the recording and the government has not yet offered any voice-identification evidence.

[8] The original trial date was April 4, 2012, with exhibit lists to be filed thirteen days prior thereto. Upon Yepa's unopposed motion to continue the trial for sixty days, the trial date was moved to June 11, 2012. Yepa then filed an unopposed motion to declare the case complex for Speedy Trial Act purposes under 18 U.S.C. § 3161(h)(7)(B)(ii). The judge granted the motion and entered a scheduling order re-setting trial for January 22, 2013, and requiring the parties to exchange their exhibit lists by November 1, 2012. The government, without opposition from the defense, requested the court issue a second scheduling order. It cited delay in obtaining the results of serology and DNA testing. The judge issued a second scheduling order but did not set a trial date. Finally, the judge *sua sponte* entered a third scheduling order. Relevant here, she required exhibit lists to be exchanged by May 15, 2013, and set a trial date of August 14, 2013. Both parties filed their original exhibit lists by the deadline.

[9] The record does not clearly establish when the recordings were requested. The prosecutor believed he made the request in June but it could have been earlier.

- 4 -

why the prosecutor waited so long to do so.[10]  In any event, the CAD (Computer Aided Dispatch) printout associated with the recording shows it came in at 9:23 p.m. on December 28, 2011, from the intersection of Highway 4 and Highway 550 in San Ysidro, New Mexico, several miles from Jemez Pueblo.[11]  It lists a phone number for the caller and describes the caller as a "very intoxicated beligerent [sic] female" who would not give her name or any other information.  (Appellant's App'x, Vol. I at 208.)  Police were dispatched to that intersection but found no one.

The recording is of an obviously intoxicated and distressed woman seeking help, yet she would not, or could not, provide her name or location.  The recording begins with the woman saying over and over "please don't" and "don't do that to me."  (Appellant's App'x, Vol. I at 291 (00:05-00:26).)  In the background, a male voice can be heard saying (over the course of the telephone call) "open your legs," "you want to get fucked or what?" and "put it in."  (Appellant's App'x, Vol. I at 190-91 n.1, 216.)  When the 911 operator asks to talk to the man she hears in the background, the woman asks the operator if she wants to talk to the "mother fucker who is fucking me?"  (Appellant's App'x, Vol. I at 191, 216.)  The call lasts 11 minutes, 43 seconds.

---

[10] Two other 911 calls were made that evening related to Becenti—one from the tribal officials upon discovering her body in Yepa's home and one made earlier in the evening concerning unrelated events regarding her boyfriend/husband.  The recordings of these calls were turned over to the defense.

[11] According to the government, calls from Jemez Pueblo regularly register as coming from the intersection of Highway 4 and Highway 550.

The government produced the 911 recording and CAD printout for the defense on June 20, 2013. It did not, however, then amend its original exhibit list to include the 911 recording.

On July 31, 2013, two weeks before trial, the prosecutors and the FBI case agent visited the JPPD offices. There, they learned for the first time that the JPPD had Becenti's cell phone, which they took as evidence. The FBI's previous requests to the JPPD for all evidence related to the Yepa case had not produced the phone, apparently because it had been tagged only in the JPPD's theft case against Adams. Nevertheless, the FBI was aware by at least December 30, 2011, (two days after the murder) that eyewitness Adams had stolen Becenti's cell phone prior to leaving Yepa's residence and had led JPPD officers "to where he had disposed of [it]." (Appellant's App'x, Vol. I at 21.) But for reasons not disclosed in the record the FBI never specifically asked the JPPD whether it had the phone or knew of its whereabouts. The government filed an amended exhibit list on August 5, 2013, adding the cell phone along with other items. It did not at this time include the 911 recording as an exhibit.

Upon recovering the cell phone, the FBI charged it and determined a call had been made from it to 911 at 9:10 p.m. on the night of Becenti's murder.[12] According to the government, it was not until agents had the phone that they "connect[ed]" the 911 call to

_____

[12] While the cell phone shows the 911 call was made at 9:10 p.m. rather than 9:23 p.m. as indicated on the CAD sheet, the government "believes the difference in timing is a result of the cellular telephone's clock not matching the clock that captures the time of 911 calls." (Appellant's App'x, Vol. I at 218 n.1.)

Becenti. (Appellant's App'x, Vol. II at 376.) On August 7, 2013, a week before trial, the prosecutors informed defense counsel they had connected the 911 recording to Becenti and would be adding the recording to its exhibit list. That same day, they filed a third amended exhibit list; in a footnote, they explained the amendment added the 911 recording as an exhibit. Two days later, they filed a fourth amended witness list, adding two witnesses to authenticate the 911 recording.[13]

On August 8, at a pretrial hearing, one of the defense counsel orally moved to exclude the 911 recording. The next day, he filed a written motion claiming exclusion was proper under the test articulated in *Wicker*, which focuses on (1) the reasons for failing to produce the evidence, (2) the prejudice to the other party, and (3) the feasibility of curing any prejudice with a continuance. 848 F.2d at 1061. The government opposed the motion; it too relied on *Wicker*.

---

[13] Yepa's defense is that someone else raped and killed Becenti while he was passed out due to intoxication. He points his finger at Adams. According to the government, the 911 recording, besides being a real-time recording of a portion of the sexual assault, is crucial to unraveling Yepa's defense because it establishes Becenti was being assaulted at approximately 9:23 p.m. According to the two friends who drove Yepa and Becenti to the liquor store, they dropped off Yepa and Becenti at Yepa's house between 8:30 and 9:00 p.m. According to these witnesses, while Yepa had been drinking, he was not heavily intoxicated at that time. That leaves "an incredibly narrow window [between 8:30 and 9:23 p.m.] for Yepa to so completely lose consciousness that he was unaware a woman who came to the house with him was being tortured in almost every room around him before she ultimately was killed." (Appellant's App'x, Vol. I at 220.)

The judge excluded the 911 recording. However, instead of relying on the factors outlined in *Wicker*, she applied the excusable neglect standard of Rule 45[14] and excluded the 911 recording because the government failed to show how its late inclusion of the recording was the result of excusable neglect. Under the excusable neglect standard, she considered (1) the danger of prejudice to the defense; (2) the length of the delay and its potential impact on judicial proceedings; (3) the reason for the delay, including whether it was within the government's reasonable control; and (4) whether the government acted in good faith. *See United States v. Torres*, 372 F.3d 1159, 1162 (10th Cir. 2004) (construing Fed. R. App. P. 4(b)(4)).

The judge decided the first and second factors weighed against the government. She concluded Yepa's preparation for trial had been "seriously disrupted" by the government's untimely designation of the 911 recording a week before trial. (Appellant's App'x, Vol. I at 270.) Because the 911 recording was (in defense counsel's words) "devastating to the defense," she reasoned Yepa was entitled to the opportunity to prepare to meet this new evidence. (Appellant's App'x, Vol. I at 270 (quotation marks omitted).) While she acknowledged a continuance could cure any prejudice, she

---

[14] Rule 45(b)(1)(B) provides:

> **In General.** When an act must or may be done within a specified period, the court on its own may extend the time, or for good cause may do so on a party's motion made:
>
> . . . .
>
> (B) after the time expires if the party failed to act because of excusable neglect.

nevertheless concluded, without explanation, that a continuance would impair Yepa's speedy trial rights. She also decided a continuance would seriously disrupt the orderly administration of her docket.[15]

As to the third factor, the judge concluded the government's lack of diligence in obtaining Becenti's cell phone caused the delay. After all, just a few days after the murder, government agents knew Becenti had a cell phone with her, Adams stole it, and Adams had led JPPD officers to where he had disposed of it; yet, they never explicitly asked JPPD officers whether they had the phone or knew where it was. Had they done so, the judge reasoned, the government would have discovered the 911 recording well before July 31, 2013.

Finally, the judge decided the prosecuting attorneys acted in bad faith—they knew the August 7, 2013 designation of the 911 recording was untimely and were well aware that the court's standing trial preparation instructions[16] as well as Rule 45 required a written motion showing excusable neglect in order to obtain relief from the court's

---

[15] She noted she and her staff had devoted many hours in preparing the case for trial, hours that could have been devoted to other time-sensitive matters deserving immediate attention.

[16] The instructions provide:

The pretrial deadlines listed below apply unless specifically modified by order of the Court. **Counsel must seek leave of the Court in the form of a written motion to extend or be excused from any pretrial deadline. Motions to extend deadlines must address how the extension will affect other case management deadlines, including the trial date.**

(Appellant's App'x, Vol. I at 28.)

deadlines. Nevertheless, the prosecutors "attempted to slip this untimely exhibit (which the United States now holds out as extremely damaging to the defense) into a Third Amended [Exhibit] list. The Court finds this to be inconsistent with good faith." (Appellant's App'x, Vol. I at 273.)

The next day the government filed this interlocutory appeal. At a status conference to address whether the district court had jurisdiction to empanel a jury after the filing of the notice of appeal, the lead prosecutor informed the judge he had referred himself to the Office of Professional Responsibility because she had attributed bad faith to him. The judge responded:

> I want the record to be very, very clear that in no way was the language utilized . . . in analyzing . . . the fourth factor—was it in any way impugning the integrity of either prosecutor in this case. It was not directed to [either prosecutor].
>
> It was noted as a part of the analysis that related to the concern the Court had about the likely opportunity, the very real opportunity that perhaps your case agent or others, other resources available to the government, could have utilized well in advance of last week, in fact many, many weeks if not months ago, to be able to connect the . . . cell phone to the [911] recording[.]
>
> And that was the reference and the intended reference. It was not directed to finding in any way specifically that [the prosecutors] committed bad faith. And I think it's important that you view that in context.

(Appellant's App'x, Vol. I at 288.)

## II. DISCUSSION

The government claims the judge abused her discretion in excluding the 911 recording because she applied the wrong legal standard, excusable neglect under Rule 45 rather than the *Wicker* factors. When the correct standard is applied, it says exclusion is

inappropriate. Yepa claims the judge was correct to demand a showing of excusable neglect because Rule 45's plain language applies to the circumstances presented here. Even assuming, however, *Wicker* is the correct standard, Yepa claims exclusion was warranted.

A.    Correct Legal Standard

"District courts have broad discretion to sanction a party who violates discovery orders." *United States v. Golyansky*, 291 F.3d 1245, 1249 (10th Cir. 2002). "We review a district court's decision to impose sanctions, and the court's choice of sanction, for an abuse of discretion." *Id.*

Since 1988, in a long line of cases, we have instructed trial courts to consider three factors in choosing the appropriate sanction when a party violates a discovery order: (1) the reasons for the delay, including whether or not the party acted in bad faith when it failed to comply with the discovery order; (2) the extent of prejudice to the other party as a result of the delay; and (3) the feasibility of curing the prejudice with a continuance. *See Wicker*, 848 F.2d at 1061; *see also, e.g.*, *Golyansky*, 291 F.3d at 1249; *United States v. Adams*, 271 F.3d 1236, 1243-44 (10th Cir. 2001); *United States v. Combs*, 267 F.3d 1167, 1179 (10th Cir. 2001); *United States v. Nichols*, 169 F.3d 1255, 1268 (10th Cir. 1999); *United States v. Gonzales*, 164 F.3d 1285, 1292 (10th Cir. 1999); *United States v. McClelland*, 141 F.3d 967, 972 (10th Cir. 1998); *United States v. Russell*, 109 F.3d 1503, 1510-12 (10th Cir. 1997); *United States v. Ivy*, 83 F.3d 1266, 1280-81 (10th Cir. 1996); *United States v. Mavrokordatos*, 933 F.2d 843, 847 (10th Cir. 1991); *United States v. Dennison*, 891 F.2d 255, 259 (10th Cir. 1989); *United States v. Peveto*, 881 F.2d 844, 863

- 11 -

(10th Cir. 1989).[17]  "[I]f a sanction is imposed, it should be the least severe sanction that will accomplish prompt and full compliance with the court's discovery orders."  *Wicker*, 848 F.2d at 1060 (quotation marks omitted).  The preferred sanction, especially in the absence of bad faith, is a continuance.  *Golyansky*, 291 F.3d at 1249 ("It would be a rare case where, absent bad faith, a district court should exclude evidence rather than continue the proceedings."); *see also Gonzales*, 164 F.3d at 1292 (agreeing with district court that "the government's conduct was the product of flagrant bad faith and that defendants' ability to prepare for trial was prejudiced by the government's obstruction of access to the subject witness" but nevertheless finding the court abused its discretion in concluding such prejudice could not be cured with a continuance); *Wicker*, 848 F.2d at 1062 ("A continuance may normally be the most desirable remedy for the government's failure to comply with a discovery order.").

Despite this settled precedent, the district judge turned to Rule 45(b)(1)(B), *see supra* n.14.  She reasoned:

> [U]nder the Court's standing trial preparation instructions, the United States was obligated to file a written motion seeking the Court's permission to add the 911 recording.  Since the motion would have been filed after the May 15, 2013, deadline for exchanging exhibit lists, the United States would have borne the burden of demonstrating excusable neglect [under Rule 45(b)(1)(B)].  The Court will not allow the United States to evade a Rule 45(b)(1)(B) showing of excusable

---

[17] Although *Wicker* involved the government's violation of Rule 16 of the Federal Rules of Criminal Procedure, 848 F.2d at 1060, its analysis has been applied in cases where no Rule 16 violation is involved, *see, e.g.*, *Combs*, 267 F.3d at 1179; *Gonzales*, 164 F.3d at 1291; *Russell*, 109 F.3d at 1510-11; and to cases where the defendant (not the government) is the violating party.  *See, e.g.*, *Adams*, 271 F.3d at 1243-44; *Combs*, 267 F.3d at 1178-79; *Nichols*, 169 F.3d at 1267-68; *Russell*, 109 F.3d at 1510-11.

neglect by failing to file the required motion requesting leave to add an untimely designated exhibit, thereby imposing on [Yepa] the burden of filing a motion to exclude. Although [Yepa] technically is the movant, the Court concludes that [his] motion turns upon the United States' showing that its untimely designation was the result of excusable neglect.

(Appellant's App'x, Vol. I at 269-70.)

It was error to apply the excusable neglect standard instead of the *Wicker* factors. Admittedly, the plain language of Rule 45 indicates it applies when a party seeks to have an extension of a "time period specified . . . in any . . . court order" after the time period has expired. *See* Fed. R. Crim. P. 45(a), (b)(1)(B). And the government did just that in this case—it sought to amend its exhibit list to include the 911 recording outside the court-ordered May 15, 2013 deadline. Moreover, as the judge indicated, had Yepa not objected to the designation of the 911 recording as an exhibit, the government would ordinarily have had to obtain permission from the court to file the amended exhibit list and, because it was outside the deadline, explain how excusable neglect justified its late inclusion of the exhibit.[18] But this reasoning ignores the long line of precedent cited above which instructs trial judges to consider the *Wicker* factors in deciding on an appropriate sanction for a discovery order violation. Yepa has pointed us to no cases, and we have uncovered none, where the excusable neglect standard of Rule 45(b)(1)(B) was applied in these circumstances. When exclusion of evidence is at issue, *Wicker* stands as a limited exception to the broader reach of Rule 45. Applying the wrong legal standard is

---

[18] However, both the government and Yepa had previously filed amended exhibit lists after the deadline without filing motions requesting permission to do so.

an abuse of discretion. *United States v. Hasan*, 609 F.3d 1121, 1127 (10th Cir. 2010) ("An abuse of discretion occurs when the district court bases its ruling on an erroneous conclusion of law or where the trial court fails to consider the applicable legal standard.") (citations and quotation marks omitted).

In fairness, we acknowledge that, while looking to Rule 45, the judge considered the option of a continuance, the hallmark of any *Wicker* analysis, as well as whether government actors were guilty of bad faith. She may have, nominally, applied the wrong standard but her analysis touched the relevant considerations. The problem, as we now explain, is that her analysis was too shallow and lacked specific fact finding, leaving us with an inadequate record upon which to conduct a proper abuse of discretion analysis. Additional fact finding and explanation is required.

B.      Remand is Appropriate

Despite the problems outlined above, both parties claim a remand is not necessary. For its part, the government argues the record is sufficient for us to hold under *Wicker* that exclusion of the 911 recording was an inappropriate sanction: (1) the untimely addition of the 911 recording to the government's exhibit list was not the product of bad faith; (2) the prejudice to Yepa was minimal because he had been provided a copy of the 911 recording seven weeks prior to the scheduled trial date; and (3) any prejudice would have been cured by a continuance.[19]

_____

[19] Yepa claims the government waived its prejudice argument. In the district court, the government said:

(Continued . . . )

- 14 -

Yepa disagrees.  He claims application of the *Wicker* factors supports an affirmance.  He says the government acted in bad faith or "very close to it."  (Appellee's Br. at 44.)  According to Yepa, the prosecutor's delay in adding the 911 exhibit is "inexcusable" given it knew about the cell phone two days after the murder and a simple request for it from the JPPD would have produced it.  (Appellee's Br. at 33.)  He also claims "[t]he government's conduct in this case evidences a profound disrespect for the district court's scheduling order and ultimately the court itself."  (Appellee's Br. at 34.)  He points to (1) the government's late disclosure (nine days before trial) of its intent to offer a footwear expert who compared Adams's boot to a footprint left at the scene, and (2) its production, fifteen days before trial, of "742 pages of new discovery, 550 recorded jail telephone calls involving Mr. Yepa totaling 150 hours, . . . 14 new trial exhibits, 30

---

A good argument can be made that Yepa is not unfairly prejudiced by admitting the 911 call and holding the current trial date.  This is particularly true given that the 911 call is anything but exculpatory. . . .  Yepa has had the 911 call for the same period the United States has had it.  And Yepa is one of only two people who knows what was said inside his house the night of the victim's death.  If this is not a recording of him telling the victim to open her legs and does not capture him asking the victim if she wants to 'get f***ed,' Yepa certainly would have recognized that when the 911 recording was first disclosed.

But the United States has not pressed the position that Yepa should have to proceed to trial with the 911 call as evidence at the current trial setting.  Instead, the United States only is insisting that, in light of Yepa's claim that he is prejudiced by the addition of the 911 call because it came too close to trial, he establish more than that he opposes a continuance before demanding that the Court resort to exclusion.

(Appellant's App'x, Vol. I at 230-31.)  We do not view this as a waiver.  The government is simply saying any prejudice to the defense is minimal and can be cured with a continuance.

'updated' photo exhibits and a one hour recorded interview with Mr. Adams."

(Appellee's Br. at 37.)

In the district court, Yepa accused the government of acting in bad faith by, among other things, adding the 911 recording to provoke a continuance. According to Yepa, the government wanted a continuance because it was not prepared for trial as it had only recently learned one of its key witnesses, Adams, had elected to invoke his Fifth Amendment right not to testify after consulting with independent counsel. Assuming that is true, losing a key witness shortly before trial is a critical problem. While marshalling compensating evidence on short notice may be inconvenient for all concerned, it strikes us as something less than bad faith. But the record is incomplete and the matter can be fleshed out on remand.[20]

Yepa also asserts the untimely designation of the 911 recording as an exhibit substantially prejudiced his defense because if the recording is allowed, he must investigate (1) the methods the government used to connect the recording to Becenti's cell phone, (2) the inconsistency between the government's claim the call originated from Yepa's house and the CAD report's indication the call originated miles away, (3) the discrepancy between the time of the call noted on the CAD report and the time noted on the cell phone, and (4) whether the voices on the recording can be identified. While the government did disclose the 911 recording to him on June 20, 2013, he claims he had no

---

[20] According to the lead prosecutor, he learned the morning of August 8, 2013, that Adams would be invoking his right not to testify; a day after the prosecution had filed the amended exhibit list adding the 911 recording.

reason to investigate it at that time because there was no indication the government would introduce the recording into evidence, especially since the exhibit list deadline had passed.

Finally, Yepa says a continuance would impair his speedy trial interests, especially since he has been incarcerated since his arrest. And, as the judge found, a continuance would disrupt the orderly administration of her docket.

"When the court of appeals notices a legal error, it is not ordinarily entitled to weigh the facts itself and reach a new conclusion; instead, it must remand to the district court for it to make a new determination under the correct law." *Hasan*, 609 F.3d at 1129 (citing *Pullman–Standard v. Swint*, 456 U.S. 273, 292 (1982) ("[W]here findings are infirm because of an erroneous view of the law, a remand is the proper course unless the record permits only one resolution of the factual issue.")). Such is the case here.

1.     Bad Faith

The primary difference between the *Wicker* factors and Rule 45's excusable neglect standard is *Wicker's* overarching preference for a continuance as opposed to the exclusion of evidence. But the two standards have a common element—the bad faith determination. *Wicker*, like the excusable neglect standard, requires the trial court to consider the reasons for the delay, including whether the violating party acted in bad faith. 848 F.2d at 1061.

The judge did find bad faith. But she vacillated. She first accused the prosecutors of bad faith, concluding they knew the designation of the 911 recording as an exhibit was untimely yet they did not attempt to show excusable neglect but instead tried to "slip" the

exhibit into a third amended exhibit list.  Thus, the judge focused on how the prosecutors went about amending the exhibit list.  But that is not the proper inquiry under *Wicker*—the proper focus is on the reasons for the delay in producing the 911 recording and whether the delay was the result of bad faith.

The judge later retracted her bad faith accusation of the prosecutors and, instead, assigned bad faith to the FBI case agents.  But the only finding made was that the agents were too cavalier, perhaps negligent, in approaching their duties, i.e., they were not diligent in locating and obtaining Becenti's cell phone.  But their ability to locate the phone was dependent in part on the tribal police.  The agents did allegedly make several requests to the JPPD for all evidence related to the case.  Had the JPPD not tagged the phone only to Adams's case, such generic requests may have produced the phone.  Of course, the agents could have specifically asked for the phone.  But even a specific request may not have produced it because of the selective tagging.  In any event, negligence alone is not bad faith.  *See Arizona v. Youngblood*, 488 U.S. 51, 58 (1988).  There must be willful conduct motivated by a desire to obtain a tactical advantage over the defense.  *See, c.f.*, *Taylor v. Illinois*, 484 U.S. 400, 415-17 (1988) (exclusion of defense witness proper for untimely disclosure where discovery violation was "both willful and blatant" and circumstances showed defense counsel "was deliberately seeking a tactical advantage"); *see also Gonzales*, 164 F.3d at 1292 (government's conduct constituted "flagrant bad faith" where it obstructed defense counsel's access to witness).

2.    Continuance

The judge did consider the prejudice to Yepa and concluded Yepa should be given an opportunity to investigate the 911 recording. However, while acknowledging a continuance could cure any prejudice, she nevertheless found a continuance would impair Yepa's speedy trial rights and seriously disrupt the orderly administration of her docket. But she did not explain how a continuance would impair Yepa's speedy trial rights, especially in light of his earlier specific request that the case be declared complex and the volume of materials involved. Critically, no findings were made as to the necessary length of a required continuance. That, it seems, is an essential ingredient in any balancing of competing interests.

On a slightly different note, this case is distinguishable from those where we have upheld a decision to exclude evidence rather than allow a continuance. The jury had already been selected in *Wicker*, 848 F.2d at 1061, and the trial had already begun in *Combs*, 267 F.3d at 1178, 1180 (one day into trial); *Russell*, 109 F.3d at 1512 (five days in to trial); and *Nichols*, 169 F.3d at 1269 (three months into trial). And in *Adams*, a four-month continuance would have been necessary for the government to conduct its own psychological examination of the defendant to counter the defendant's untimely disclosure of a psychological report three days prior to trial; such a lengthy continuance would have "significantly delay[ed] the trial." 271 F.3d at 1243-44. Here, the trial had not yet begun and it does not appear anything like a four-month continuance would be necessary for the defense to adequately investigate.

Defense counsel and the district judge were understandably angry and frustrated by the "avalanche" of new evidence unceremoniously, perhaps improperly, released by the government on the eve of trial. But anger and frustration cannot be the watch words. Bad faith (not negligence) is one, but it needs to be clearly determined. If there is no bad faith, a clear explanation of why the preferred remedy of a continuance is inappropriate is certainly necessary. *Golyansky*, 291 F.3d at 1249 ("It would be a rare case where, absent bad faith, a district court should exclude evidence rather than continue the proceedings."). However, even if bad faith is evident, an explanation of why a continuance is an inadequate remedy is still needed. *See Gonzales*, 164 F.3d at 1292 (agreeing with the district court that the government acted in "flagrant bad faith" but concluding the court abused its discretion in deciding any prejudice to defendant could not be cured with a continuance).

On remand, the district judge should conduct a plenary hearing, make specific findings regarding each of the *Wicker* factors, and issue a clearly articulated decision properly balancing competing interests.

**REVERSED AND REMANDED**.

**Entered by the Court:**

**Terrence L. O'Brien**
United States Circuit Judge