**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

     Plaintiff - Appellant,

v.

GAVIN YEPA,

     Defendant - Appellee.

No. 15-2018
(D.C. No. 1:12-CR-00163-MCA-1)
(D. New Mexico)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **BRISCOE**, Chief Judge, **GORSUCH**, and **McHUGH**, Circuit Judges.
_____

## I.  INTRODUCTION

Gavin Yepa is accused of killing Lynette Becenti during a brutal sexual assault. A week before his scheduled trial, and almost three months after the deadline for the exchange of exhibit lists, the government amended its exhibit list to include a 911 recording of a call from Ms. Becenti's cell phone allegedly made while she was being sexually assaulted. As a sanction for the government's failure to comply with the court's scheduling order, the district court excluded the call. On a prior interlocutory appeal, a panel of this court reversed and remanded for the district court

_____

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

to select a discovery sanction using the framework we outlined in *United States v. Wicker*, 848 F.2d 1059 (10th Cir. 1988). *See United States v. Yepa*, 572 F. App'x 577, 587 (10th Cir. 2014) (unpublished).

On remand, the district court conducted an evidentiary hearing, considered the factors identified in *Wicker*, and again excluded the recording. The government then filed this appeal and argues the district court abused its discretion by excluding the evidence rather than granting a continuance. We affirm.

## II. BACKGROUND

### A. *Factual History*

Ms. Becenti was gruesomely murdered on December 28, 2011, in Mr. Yepa's home. *United States v. Yepa*, 572 F. App'x 577, 578 (10th Cir. 2014). An autopsy concluded that her death resulted from being penetrated vaginally with the handle of a shovel. *Id.* The government indicted Mr. Yepa for the murder.

Based on the pretrial record, the government anticipates the evidence will show that Mr. Yepa and two friends picked up Ms. Becenti as she was walking along a road at night. *Id.* The two friends drove Mr. Yepa and Ms. Becenti, who had already been drinking heavily, to a liquor store in San Ysidro, New Mexico, where Mr. Yepa purchased a bottle of vodka. *Id.* They then dropped Ms. Becenti and Mr. Yepa at Mr. Yepa's house in Jemez Pueblo between 8:30 and 9:00 p.m. and left. *Id.* Another of Mr. Yepa's friends, Rodney Adams, arrived at Mr. Yepa's house between 9:45 and 10:00 p.m. and later told police that he witnessed Mr. Yepa sexually

2

assaulting Ms. Becenti. *Id.* Rather than intervening, Mr. Adams stole Ms. Becenti's cellular telephone from her backpack and left.

Later that evening, at about 11:50 p.m., Mr. Yepa flagged down Jemez Pueblo tribal officials and told them a woman was in his house, she was not breathing, and that he had brought her home hoping to have sex with her. *Id.* The tribal officials observed a large amount of blood in Mr. Yepa's home, extending from the master bedroom, across the living room and into another bedroom. *Id.* Ms. Becenti's nude body was found covered with blood; a shovel was found near her body and the first fifteen inches of its handle was coated with blood. *Id.* Mr. Yepa's clothing was stained with blood and blood was imbedded around his fingernails and toenails. *Id.*

The investigation later uncovered another piece of evidence which became the subject of this appeal: a recording from the Sandoval County Emergency Dispatch System of a 911 call received from Ms. Becenti's cell phone, possibly made while she was being sexually assaulted. *Id.* at 579. The call occurred sometime between 9:10 p.m. and 9:30 p.m. on the evening of December 28, 2011.[1]

The 911 call was automatically recorded by the Sandoval County Regional Emergency Communications Center ("SCRECC"). In it, an obviously intoxicated female caller asks for assistance. But the caller is unable to identify herself, the location from which she is calling, or the nature of her emergency. A male can be

---

[1] The precise time of the 911 call is not clear from the record. A report prepared by Sandoval County Regional Emergency Communications Center indicates the call occurred at approximately 9:23 p.m. However, the cell phone's call log shows an outbound 911 phone call placed at 9:10 p.m.

heard talking in the background during the call, but the caller could not identify him. And when the 911 operator asked her to put the male on the phone, the caller became angry, inquiring "You want to talk to the f---ing motherf---er that is f---ing me?" The woman can also be heard pleading with the man, saying "please don't do that to me." According to government witnesses, the caller was Ms. Becenti, and the male voice belongs to Mr. Yepa.

### B.   *Procedural History*

### 1.  The Discovery of the Cell Phone

After Mr. Yepa first contacted Jemez Pueblo tribal officials on the night of Ms. Becenti's death, the Jemez Pueblo Police Department (JPPD) responded and secured the crime scene. JPPD Chief Mike Toya contacted the FBI. An FBI Evidence Recovery Team, led by Special Agent Ben Bourgeois, arrived on scene shortly after 2:00 a.m. the morning of December 29, 2011.

The day after the murder, December 29, the JPPD identified three relevant 911 calls made to the SCRECC on the evening of December 28 and provided Agent Bourgeois with printed copies of the Computer Assisted Dispatch (CAD) reports of the three calls. The second CAD report was the report of the 911 call at issue in this case, and included the caller's phone number but not the caller's name. Agent Bourgeois did not consider the CAD reports to be a priority, and he did not ask why the JPPD associated these CAD reports with the homicide. Agent Bourgeois filed the CAD reports and then apparently forgot about them for some time.

4

The evening of December 29, 2011, Mr. Adams appeared at the JPPD in an intoxicated and unstable condition. He was arrested after a confrontational encounter with JPPD Officer Gary Tafoya. While receiving medical care for an injury Mr. Adams suffered during the arrest, Mr. Adams made a statement to Officer Tafoya about the evening of December 28, 2011. He claimed to have witnessed a sexual assault by Mr. Yepa, admitted that he took the victim's cell phone from her bag, and told Officer Tafoya that he later abandoned the phone at a gas station.

Early the morning of December 30, Officer Tafoya went with Officer Jordan Shendo to the location described by Mr. Adams to search for the phone. They retrieved the phone, and Officer Tafoya informed Chief Toya that it had been found.

During his next shift, Officer Tafoya prepared two reports. The first described his altercation with Mr. Adams, and a supplemental report summarized Mr. Adams's statement and the recovery of the cell phone. The supplemental report was tagged with an identification number associated with the homicide. Officer Tafoya then logged the cell phone and a recording of Mr. Adams's statement into evidence and placed them in an evidence locker. The evidence forms for both referenced the homicide's identification number. Officer Tafoya placed both reports and copies of the evidence forms in Chief Toya's inbox.

Chief Toya apparently reviewed the report relating to Mr. Adams's arrest but did not read the supplemental report. Both reports were then filed together in a file not related to the homicide.

On December 30, 2011, FBI Agent Bourgeois executed an affidavit in support of a criminal complaint against Mr. Yepa. The affidavit indicates that Mr. Adams stole Ms. Becenti's cell phone and that JPPD was attempting to recover the phone. Agent Bourgeois may have learned about the phone from Chief Toya, at a time before Chief Toya learned the phone had been recovered.

Mr. Yepa was charged on December 30, 2011, and a grand jury returned an indictment against him on January 28, 2012. Meanwhile, the JPPD retained custody of Ms. Becenti's cell phone.

The JPPD is a small police department with a single evidence room. As a practical matter, one individual, C.I. Soto, was responsible for tracking evidence during the investigation into Ms. Becenti's murder. On January 2, 2012, C.I. Soto logged the cell phone into the evidence room under the identification number for the homicide. Based on that information, C.I. Soto would have been able to produce Ms. Becenti's cell phone in response to a request for it made any time subsequent to January 2, 2012.

At some point, likely around January 4, 2012, Agent Bourgeois asked Chief Toya for "any items related to the homicide in his custody or in their administrative files or anything like that."[2] C.I. Soto produced a mixed bundle of documents,

---

[2] The prosecution initially represented to the district court that the FBI had made "repeated" requests to the JPPD for information or evidence related to the homicide, and that the cell phone had been incorrectly tagged. After the evidentiary hearing on remand, the district court concluded that neither of these representations was true.

including documents related to the tribal charges against Mr. Adams and documents related to the homicide. The JPPD did not produce the cell phone at that time.

## 2. Connecting the Cell Phone and Recording to this Case

The district court set the case for trial on April 4, 2012. The court's initial instructions required disclosure of exhibit lists thirteen days prior to trial. The case was later designated complex and the trial was continued multiple times. The district court's third scheduling order set the trial for August 14, 2013, and required an exchange of exhibit lists by May 15, 2013, three months before trial. The United States filed a timely exhibit list on May 15, 2013.

It took nearly a year and a half for the prosecution to follow up on the cell phone and 911 recording. In June of 2013, while in final trial preparation, Assistant United States Attorney Mark Baker and Agent Bourgeois reviewed a recording of the 911 call and the corresponding CAD report. Neither immediately connected it to this case. The prosecution then provided the recording and CAD report to the defense on June 20, 2013, but did not indicate that it intended to use either at trial. However, AUSA Baker requested that Agent Bourgeois determine whether the phone number referenced in the CAD report tied back to the homicide.

Agent Bourgeois did not act on AUSA Baker's request. Because the call appeared to come from a location a few miles away from the homicide, involved an intoxicated, belligerent woman, and prompted only a welfare check by the JPPD, Agent Bourgeois assumed the call had no significance to the murder investigation. Agent Bourgeois could have used the 911 caller's phone number to determine the

7

caller's service provider, and from there presumably identified the caller, but he did not do so.

On July 31, 2013, Agent Bourgeois and two prosecutors traveled to the Santa Ana Pueblo Police Department to interview one of the tribal officials who initially discovered Ms. Becenti's body and reported the homicide. Coincidently, Officer Tafoya had previously left the JPPD and joined the Santa Ana Pueblo Police Department. Officer Tafoya's new office was close enough to the interview room that he overheard parts of the interview and realized it concerned Ms. Becenti's homicide. Officer Tafoya introduced himself, and told Agent Bourgeois and the prosecutors about Mr. Adams's statement and that Ms. Becenti's cell phone had been recovered.

Later that same day, Agent Bourgeois phoned the JPPD to request anything connected to Mr. Adams, and the agent and prosecutors drove to the JPPD. When they arrived, C.I. Soto produced the cell phone and various documents related to Officer Tafoya's reports.

Between August 1 and August 5, 2013, Agent Bourgeois found a charger for the cell phone, charged it, and scrolled through the phone's call log. He learned the phone had called 911 on the evening of December 28, 2011, and notified the prosecution of his discovery.

On August 7, 2013—a week after obtaining the cell phone from the JPPD and a week prior to the scheduled trial date of August 14—Agent Bourgeois asked another FBI agent, Agent Leroy Chavez, to download information from the cell phone. Agent Chavez was unable to do so, but took photos of the cell phone's screen.

8

The phone's call log showed a 911 call at 9:10 pm on December 28, 2011—the date and approximate time of the murder. Agent Bourgeois again informed the prosecution.

That same day, AUSA Baker contacted defense counsel to provide notice that the United States intended to introduce the 911 recording at trial. The prosecution also filed a Third Amended Exhibit List that day, which included the 911 recording.

## 3. Exclusion of the Call

On August 8, 2013, Mr. Yepa moved to exclude the 911 call as a sanction for the government's violation of the scheduling order.[3] The district court granted his motion. Following an interlocutory appeal, this court reversed because the district court had applied the wrong legal standard in choosing the appropriate sanction. *United States v. Yepa*, 572 F. App'x 577, 587 (10th Cir. 2014). We remanded with instructions to apply the correct legal framework.

On remand, the district court conducted an evidentiary hearing to investigate the reasons for the government's untimely addition of the 911 call to its exhibit list. After the hearing, the district court entered a detailed order in which it again excluded the 911 recording. We have jurisdiction over the government's interlocutory appeal challenging that decision under 18 U.S.C. § 3731.

---

[3] Mr. Yepa provided alternative grounds for excluding the 911 call, relying on the Confrontation Clause and Rule 403, and arguing the government could not provide foundation for the recording. These claims are not before us on appeal, and therefore we do not address them further.

### III. DISCUSSION

#### A. *Standard of Review*

We review the district court's decision to exclude evidence as a sanction for discovery violations for abuse of discretion. *United States v. Banks*, 761 F.3d 1163, 1196 (10th Cir. 2014). But we review the district court's findings of fact for clear error. *United States v. Gonzales*, 164 F.3d 1285, 1289 (10th Cir. 1999).

#### B. *Analysis*

There are three principal factors that a district court should consider in determining the appropriate sanction for violating a scheduling order: (1) the reason for the delay, including whether the non-compliant party acted in bad faith; (2) the extent of prejudice to the other party; and (3) "the feasibility of curing the prejudice with a continuance." *United States v. Wicker,* 848 F.2d 1059, 1061 (10th Cir.1988). But these "three factors merely guide the district court and do not dictate the bounds of the court's discretion." *United States v. Russell*, 109 F.3d 1503, 1511 (10th Cir. 1997). And while "[t]he court should impose the least severe sanction that will accomplish prompt and full compliance with the discovery order," *United States v. Gonzales*, 164 F.3d 1285, 1292 (10th Cir. 1999), in some circumstances a district court may "suppress evidence that did not comply with discovery orders to maintain the integrity and schedule of the court even though the [party entitled to the disclosure] may not be prejudiced" *Wicker*, 848 F.2d at 1061. This is because our admonition that a continuance is preferred "does not mean that a continuance is necessary just because it will cure the prejudice." *Russell*, 109 F.3d at 1512.

10

Regarding the first factor we identified in *Wicker*, exclusion is ordinarily only appropriate where a party acts in bad faith or lacks any legitimate reason for a delay. *See Banks*, 761 F.3d at 1199; *United States v. Golyansky*, 291 F.3d 1245, 1250 (10th Cir. 2002); *United States v. Adams*, 271 F.3d 1236, 1244 (10th Cir. 2001); *Gonzales*, 164 F.3d at 1292; *United States v. Red Elk*, 185 F. App'x 716, 721–23 (10th Cir. 2006) (unpublished).[4] But our case law also establishes that negligence alone can justify excluding evidence. For instance, in *Wicker* the prosecution made a single request that an expert mail a report to the defense and then failed to follow up, resulting in the report being disclosed to the defense only a few days before trial. 848 F.2d at 1060–62. Although the prosecution's oversight was merely negligent, we affirmed the district court's exclusion of the expert's testimony based on the impact a continuance would have had on the court's schedule and on the jurors, who had already been empaneled. *Id.* at 1062. *See also Red Elk*, 185 F. App'x at 723–25 (affirming trial court's exclusion of expert testimony where government's negligence in following up with expert resulted in expert's report being provided to defense well after the discovery deadline).

We agree with the district court that the government's negligence here is similar to that in *Wicker*.[5] The prosecution and the FBI took a careful look at the

---

[4] Though not precedential, we find the reasoning of this court's unpublished opinions instructive. *See* 10th Cir. R. 32.1 ("Unpublished opinions are not precedential, but may be cited for their persuasive value.").

[5] The government has not asked us to determine the precise scope of the "government" for purposes of assessing responsibility for the delay in identifying the

CAD reports and 911 calls only after the expiration of the discovery deadlines. Before then, Agent Bourgeois made a single request for relevant evidence from the JPPD, even though he was aware the JPPD searched for the victim's cell phone as early as December 30, 2011. And Agent Bourgeois did not follow up with the JPPD or comply with AUSA Baker's June 2013 instruction to determine whether the CAD report and 911 call were connected to Ms. Becenti's murder. In turn, AUSA Baker did not check back with Agent Bourgeois to assure that this had been done. Even after Agent Bourgeois and AUSA Baker obtained the cell phone, they failed to review its contents for a week. As a result, the defense first learned of the prosecution's intention to introduce the 911 recording only one week before trial. Considering these facts, the district court found the government did not act in bad faith. But it concluded the government acted negligently and thus did not have a legitimate reason for the delay in designating the 911 recording on its exhibit list.[6]

_____

911 recording as a trial exhibit. *Compare Smith v. Sec'y of N.M. Dep't of Corrections*, 50 F.3d 801, 824 (10th Cir. 1995) (holding that for the purposes of discovery obligations under *Brady v. Maryland*, 373 U.S. 83 (1963), the "prosecution" includes the prosecutor's entire office, law enforcement personnel, and other arms of the state involved in the investigation), *and United States v. Beers*, 189 F.3d 1297, 1304 (10th Cir. 1999) (holding that while material in the possession of *federal* investigating officers can be imputed to federal prosecutors for *Brady* purposes, material in *state* officials' possession cannot), *with United States v. Wicker*, 848 F.2d 1059, 1062 (10th Cir. 1988) (distinguishing between the government and an expert employed by the prosecution).

[6] The government's opening brief does not challenge the district court's conclusion on this point. To the extent the government's reply brief can be read to argue the district court clearly erred by faulting Agent Bourgeois or AUSA Baker, the government waived these arguments by raising them for the first time on appeal in a reply brief. *United States v. Pablo*, 696 F.3d 1280, 1299 n.21 (10th Cir. 2012).

12

Next, *Wicker* directs courts to consider the prejudice the delay caused to the other party. Typically, prejudice requires that a delay impact the defendant's ability to prepare or present his case. *Golyansky*, 291 F.3d at 1250; *see United States v. Ivy*, 83 F.3d 1266, 1280 (10th Cir. 1996). The district court found that Mr. Yepa could not adequately prepare for trial given the government's late designation of the 911 recording. We cannot conclude the district court clearly erred in finding that Mr. Yepa would need additional time to alter his trial strategy to account for the 911 recording and that Mr. Yepa would have had to allocate trial preparation resources to challenge the admission and substance of the recording.

The third *Wicker* factor asks whether a continuance is feasible and can cure the prejudice to a defendant. As discussed in our prior ruling in this case, absent bad faith or a trial already in progress, a continuance is typically the appropriate remedy. *Yepa*, 572 F. App'x at 586; *see United States v. Combs*, 267 F.3d 1167, 1179 (10th Cir. 2001); *United States v. Nichols*, 169 F.3d 1255, 1268 (10th Cir. 1999); *Russell*, 109 F.3d at 1510–12. To say that a continuance is *typically* appropriate, however, must mean that exclusion is permissible in some circumstances. *See Adams*, 271 F.3d at 1243–44; *Wicker*, 848 F.2d at 1061; *Red Elk*, 185 F. App'x at 723–25. Thus, even when a continuance is possible, the district court may consider the impact of a continuance on the court's calendar, on the jurors, on the integrity of a court's orders, and whether a continuance might create other problems. *Wicker*, 848 F.2d at 1061; *Red Elk*, 185 F. App'x at 725.

13

Here, the district court determined that a continuance of four to eight weeks would be necessary to allow Mr. Yepa to prepare for trial if the 911 call was admitted. [7] It then noted the disruptive impact such a delay would have on the court's schedule and that of a visiting judge, who had agreed to preside over Mr. Yepa's trial. And the district court expressed concern about the inconvenience a continuance would cause to the jurors, who had been summoned but not yet empaneled. The inconvenience to jurors who have actually been selected, as in *Wicker,* is undeniably greater than the inconvenience to the jurors here, who had only been summoned. But nothing in our prior decisions precludes a district court from weighing that admittedly lessor inconvenience in selecting an appropriate discovery sanction. *See Wicker*, 848 F.2d at 1061 (noting that the three identified factors "are not intended to dictate the bounds of the court's discretion").

Thus, the district court considered each of the three factors specifically identified in *Wicker*. In addition, consistent with our acknowledgement in *Russell* that the *Wicker* factors do not delineate the outer bounds of the analysis, 109 F.3d at 1511, the district court concluded that a four to eight week continuance would

_____

[7] We reject the government's argument that because Mr. Yepa initially stipulated to a scheduling order providing for designation of exhibits four weeks prior to trial, a four week continuance would have been sufficient. We review questions of fact for clear error. *United States v. Gonzales*, 164 F.3d 1285, 1289 (10th Cir. 1999). It was not clearly erroneous for the district court to conclude that more preparation might be required than contemplated in the parties' initial stipulated scheduling order where this case was designated complex, the district court repeatedly entered scheduling orders providing for disclosure of exhibits more than a month prior to trial, the parties produced a substantial amount of evidence after the initial scheduling order was entered, and the court concluded the 911 recording required the defense to reassess its trial strategy.

14

inequitably extend Mr. Yepa's pretrial incarceration. As of the date of the initial hearing on the motion to exclude the 911 recording, Mr. Yepa had been confined without bail for 592 days, from December 29, 2011, to August 11, 2013. The district court reasoned that the government's late disclosure would effectively force Mr. Yepa to choose between having a fair trial after a continuance in which the defense could prepare for the introduction of the 911 recording, and avoiding six to eight weeks of additional pretrial incarceration but being unable to respond effectively to the 911 call.[8] The district court did not abuse its discretion by considering, in conjunction with the *Wicker* factors, the impact of a continuance on the length of Mr. Yepa's pre-trial incarceration.

Other concerns highlighted by our precedent also support the conclusion the district court acted within its discretion. First, excluding the recording will not preclude a just adjudication of this case. *Red Elk*, 185 F. App'x at 724. To some extent, the 911 recording corroborates Mr. Adams's statements,[9] and it may have had

---

[8] Although the decision to exclude the evidence has, in fact, caused Mr. Yepa to endure many more than eight weeks of pretrial incarceration during the pendency of the interlocutory appeals of that decision, we have never required the district courts to anticipate the parties' responses to rulings in choosing an appropriate sanction. For example, in concluding that the district court did not exceed its discretion by excluding the evidence in *Wicker*, we considered the facts and circumstances as of the time the district court entered its order, without the benefit of hindsight. *United States v. Wicker*, 848 F.3d 1059, 1062 (10th Cir. 1988).

[9] Notably, the 911 recording also calls into question certain aspects of Mr. Adams's statement to police. As the district court noted, "[Mr.] Adams's statement that he found [Ms. Becenti's] cellphone in her purse or bag presents the perplexing question of how [Ms. Becenti's] cellphone found its way into [her] purse or bag following the sexual assault captured in the recording of the 9:23 p.m. 911 call."

15

a powerful emotional impact on the jury. But even without the recording, the government has substantial evidence against Mr. Yepa including: testimony from Mr. Yepa's friends that they dropped Ms. Becenti at Mr. Yepa's home shortly before the estimated time of the murder; Mr. Adams's eyewitness account of the sexual assault; the blood and murder weapon found in Mr. Yepa's home, the blood on Mr. Yepa's person, and forensic evidence from the crime scene in the nature of fingerprint, serological, and DNA evidence.

Although we have identified a continuance as the preferred sanction in the absence of bad faith, we have not removed all discretion from the trial court. Rather, "[e]ven in the absence of prejudice, integrity and scheduling considerations alone may justify suppression of otherwise admissible evidence offered by the delinquent party." *Russell*, 109 F.3d at 1511. Here, by the time the government amended its exhibit list to include the 911 recording, jurors had been summoned for the upcoming trial, the court and its staff had devoted considerable effort to prepare for trial, and a visiting judge from the District of Wyoming had arranged to travel to New Mexico to preside over the case. The district court carefully considered these facts and the factors we identified in *Wicker* before ruling the government could not introduce the 911 recording at trial. Our preference for a continuance remains, but we cannot conclude the district court exceeded its discretion by instead excluding the 911 recording. *See United States v. Sims*, 776 F.3d 583, 586 (8th Cir. 2015) ("Though the district court did not have to remedy the situation by excluding the evidence and

16

could have imposed an alternative sanction, the court had discretion to impose the sanction it did.").

Finally, the government argues that Supreme Court cases decided since *Wicker* call our analysis into question, because they state that the exclusion of evidence is disfavored except to deter government misconduct. *See, e.g.*, *Herring v. United States*, 555 U.S. 135, 141 (2009). But these exclusionary rule decisions are not analogous. The link between misconduct and exclusion is appropriate in Fourth Amendment cases because, by virtue of an unconstitutional search or seizure, the defendant's Fourth Amendment rights have already been violated. In that context, the court excludes the wrongfully obtained evidence to deter future misconduct. *Id.* But when crafting a discovery sanction, a district court can still remedy the harm caused by noncompliance with the court's discovery order both with respect to the injury to the other party and as to the court's own interests. *Combs*, 267 F.3d at 1179; *Nichols*, 169 F.3d at 1268–69; *Wicker*, 848 F.2d at 1061. Accordingly, we reject the government's assertion that the sanction of exclusion may be imposed in this context only in response to misconduct.[10]

---

[10] Relying on *United States v. Ivy*, 83 F.3d 1266 (10th Cir. 1996), the government also argues that Mr. Yepa's opposition to a continuance precluded him from seeking exclusion of the evidence. But the government misapprehends the general rule that a defendant who does not request a continuance may not be heard to complain on appeal that he suffered prejudice as a result of late-arriving discovery. The principle does not apply where a district court excludes evidence, because a defendant in those circumstances has no need to seek a continuance. *United States v. Davis*, 244 F.3d 666, 672 (8th Cir. 2001).

17

## IV. CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court's exclusion of the 911 recording and **REMAND** for further proceedings.

Entered for the Court


Carolyn B. McHugh
Circuit Judge

No. 15-2018, United States v. Yepa

**BRISCOE**, Chief Judge, dissenting.

I dissent. In my view, nothing in the record supports the district court's decision to impose the drastic sanction of excluding from trial what is a highly incriminatory and potentially trial-altering piece of evidence. I therefore conclude that the district court abused its discretion and would remand with directions to admit the evidence at trial.

I

*Standard of review*

"District courts have broad discretion to sanction a party who violates discovery orders" or other pretrial scheduling orders. United States v. Golyansky, 291 F.3d 1245, 1249 (10th Cir. 2002). "In the absence of a finding of bad faith, the court should impose the least severe sanction that will accomplish the prompt and full compliance with the discovery order." Id. "The preferred sanction is a continuance," and "[i]t would be a rare case where, absent bad faith, a district court should exclude evidence rather than continue the proceedings." Id.

"[W]e review a court's decision to impose sanctions and its choice of sanctions for abuse of discretion." United States v. Gonzales, 164 F.3d 1285, 1291 (10th Cir. 1999). Generally speaking, "[a] district court abuses its discretion only if its ruling is arbitrary, capricious, whimsical or manifestly unreasonable or when we are convinced that the district court made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances." United States v. Garcia, 635 F.3d 472, 476 (10th Cir. 2011) (internal quotation marks omitted).

*Wicker and its guiding factors*

In United States v. Wicker, 848 F.2d 1059 (10th Cir. 1988), we considered an interlocutory appeal filed by the government challenging a district court order excluding evidence from a criminal trial as a sanction for the government's production of a laboratory and scientific report to the defendants just days prior to the start of trial. In reviewing the order of exclusion at issue in Wicker, we began by noting that "Rule 16(d)(2) of the Federal Rules of Criminal Procedure gives [a] district court broad discretion in imposing sanctions on a party who fails to comply with a discovery order." Id. at 1060. We cautioned, however, that "[d]espite this broad grant of power, [a] district court's exercise of discretion should be guided by several factors; and if a sanction is imposed, it should be the least severe sanction that will accomplish . . . prompt and full compliance with the court's discovery orders." Id. (ellipsis in original; internal quotation marks omitted).

We proceeded to outline three factors that a district court should consider "[w]hen the government fails to comply with a discovery order." Id. at 1061. First, a district court should consider "the reasons the government delayed producing the requested materials, including whether or not the government acted in bad faith when it failed to comply with the discovery order." Id. Second, a district court must consider "the extent of prejudice to the defendant as a result of the government's delay." Id. Third, a district court must consider "the feasibility of curing the prejudice with a continuance." Id. These three factors, we emphasized, "are not intended to dictate the bounds of [a district] court's

2

discretion," but rather "should merely guide the district court in its consideration of sanctions." Id. For example, we noted, "[o]n occasion [a] district court may need to suppress evidence that did not comply with discovery orders to maintain the integrity and schedule of the court even though the defendant may not be prejudiced." Id.

Since Wicker, we have applied its guiding factors in similar contexts, such as where the government violates a district court's scheduling orders. See, e.g., United States v. Russell, 109 F.3d 1503, 1511 (10th Cir. 1997) (holding that "Wicker is a satisfactory precedent to deal with violations of orders requiring pretrial disclosure of witnesses."). And, indeed, the prior panel in this case directed the district court on remand to consider and apply the factors outlined in Wicker to determine what, if any, sanction to impose on the government for its belated disclosure of its intention to introduce at trial the 911 recording made by the victim shortly prior to her death.

II

*The district court's analysis of the first Wicker factor*

In its order on remand, the district court began by analyzing the first Wicker factor, i.e., the reasons for the government's untimely designation of the 911 recording as a trial exhibit. As part of its analysis, the district court made detailed findings of fact regarding the investigation of the murder at issue in this case, including, in particular, the events leading to the government's discovery, and subsequent disclosure to the defense and the district court, of the victim's cell phone and the recording of the 911 call that the victim made shortly prior to her death. Unfortunately, the district court clearly erred, and was

3

unreasonably critical of the case agent, Federal Bureau of Investigation (FBI) Special

Agent Ben Bourgeois, in at least two respects.

A

To begin with, the district court held Agent Bourgeois responsible, and effectively

characterized him as having acted negligently, for failing to determine, shortly prior to the

scheduled trial date in August 2013, that the victim made a 911 call from Yepa's house.

In particular, the district court stated as follows:

> By December 29, 2011, the [Jimenez Pueblo Police Department (JPPD)] had associated the Becenti homicide with three 911 calls made to [the Sandoval County Regional Emergency Communications Center (SCRECC)] on the evening of December 28, 2011. On December 29, 2011, the JPPD provided Agent Bourgeois with printed copies of the Computer Assisted Dispatch [(CAD)] reports of the three calls. The first CAD report concerned a 911 call relating to Ms. Becenti's boyfriend, Tom Collateta. The second CAD report was the report of the 9:23 p.m. 911 call. The third CAD report was the report of tribal official Clint Sando's 911 call reporting an "unresponsive female." Agent Bourgeois did not consider the information in the CAD reports to be a priority. It did not occur to him to ask why the JPPD had associated these three CAD reports with the Becenti homicide. The CAD reports were filed and thereafter apparently forgotten by Agent Bourgeois.

App., Vol. II at 534-35 (internal citations omitted).

A close review of that second CAD report, however, reveals why Agent Bourgeois

chose not to investigate it, at least initially. The upper portion of the report describes the

"Call Type" as "087 Welfare Check." Id. at 391. The upper portion further lists the

caller's location as the intersection of Highway 550 and Highway 4 in San Ysidro, New

Mexico. Although there is a space for the caller's name and address, those items are

4

blank. Only the caller's phone number is listed. The middle portion of the report,

entitled "NARRATIVE," provides the dispatcher's description of the call, her response to

it, and the responding police officer's description of what he observed in attempting to

physically trace the caller at the described location:

> voip 911 calll [sic] from a very intoxicated beligerent [sic] female
> voip only comes in phase one showing area of 550 and hwy 4
> female would not give me her name or any info
> rings then hangs up
> located another possible tx 720 494 5800 attempting t25
> no answer at all on this number, no option to leave a
> message
> attempting t25 w/rp again
> voicemail comes back to a female / / left message
>
> 244; it appears that the family dollar is closed right now.
> the intersection at hwy4/550, i don't see anybody.
> 244; re-check of the gas station, there is only 2 employees
> there now.
>
> possibly first name of ananton?

Id. Finally, the lower portion of the report lists the "Unit Status History Information." Id.

This lists the name of the dispatched officer, the time he was dispatched to perform the

welfare check, the time he arrived on the scene, and the time he completed the check and

returned to "Available" status. Id.

Simply put, nothing in this second CAD report would have remotely alerted a

reasonable officer to the fact that the call was made by the victim, from Yepa's house,

during the midst of the sexual assault that led to her death.[1] Nor does the report indicate

_____

[1] As the district court explained in its order on remand, the evidence presented at

(continued...)

5

that a male's voice can be heard in the background. As a result, it is entirely understandable why Agent Bourgeois chose, in the days and months immediately following the murder, to focus his investigative efforts elsewhere.

B

The district court was also critical of Agent Bourgeois for not directly asking the JPPD: "Did the officers recover the [victim's] cellphone?" Id. at 543. In addition, the district court found that "[t]he JPPD did not produce the cellphone prior to July 31, 2013 because . . . Agent [Bourgeois] never requested it." Id.

These findings, however, ignore the undisputed testimony of Agent Bourgeois and Ray Soto, the JPPD officer in charge of the JPPD's evidence locker at the time of these events. Agent Bourgeois testified that, based upon memorandums of understanding between the FBI and the Bureau of Indian Affairs, all tribal law enforcement agencies, including the JPPD, were required to submit to the FBI all relevant evidence and documents pertaining to any case in which the FBI was involved. Officer Soto affirmed Bourgeois' testimony on this point. Specifically, Soto testified that when the FBI assumes responsibility for a case and asks for evidence, the tribal law enforcement agency is supposed to turn over all evidence in the case. App., Vol. V at 970. Soto further testified that this is a standing request that is understood among all law enforcement

_____

[1](...continued)
the evidentiary hearing indicated "that the location information provided by the SCRECC" on the second CAD report "involved some form of anomaly that made it appear that the phone call came from a location miles away from [Yepa]'s residence." App., Vol. II at 547.

6

personnel. Id. Thus, contrary to the district court's findings, it was the JPPD that was negligent in failing to turn over the victim's cell phone to Agent Bourgeois at the beginning of his investigation, in response to his request to Chief Toya for all items related to the homicide.[2] And, again contrary to the district court's findings, it was entirely reasonable for Agent Bourgeois to assume, based upon the fact that the JPPD did not turn over the victim's cell phone to him in response to his request for all of the evidence, that the cell phone had not been located.

C

Setting aside the district court's clearly erroneous factual findings, it is apparent that the government's delay in designating the 911 recording as a trial exhibit was, in significant measure, the result of the JPPD's failure in responding adequately to Agent Bourgeois' clear and unequivocal request for all of the case materials and evidence at the outset of his investigation. More specifically, it is apparent that the JPPD's evidence officer acted negligently in failing to turn the victim's cell phone over to Agent Bourgeois.

The worst that can be said of Agent Bourgeois's performance is that, between mid-

---

[2] The district court found that, "[a]t most, the JPPD can be criticized for not asking Agent Bourgeois if the FBI wanted the evidence it had collected." App., Vol. II at 542. Officer Soto's testimony, however, makes clear that he knew the FBI would have wanted all of the evidence related to the case, including the victim's cell phone. And Soto was apologetic for failing to turn the phone over to Agent Bourgeois. Id., Vol. V at 975 (when asked if he had "an intent of any sort to keep this piece of evidence from the FBI or from the defense," Soto testified: "No, ma'am. There was nothing intentional or malicious; just I had too much on my plate maybe.").

7

June and late July of 2013, he failed, in response to a request from the lead prosecutor, to determine if the phone number listed on the second CAD report belonged to the victim. Agent Bourgeois was also, debatably, slow in examining the contents of the victim's cell phone after it was obtained from the JPPD on July 31, 2013. Considered together, these actions at most caused a two-month delay in the government's decision to notify the defense team of its intention to use the 911 recording as a trial exhibit.[3]

Most importantly, as the district court itself ultimately conceded (even despite its clearly erroneous factual findings), there is no evidence whatsoever that the government acted in bad faith.

### III

### *The second and third Wicker factors*

In assessing the second and third Wicker factors (the extent of prejudice to the defendant caused by the delay, and the feasibility of curing the prejudice with a continuance), the district court found that the government's "delay in designating the 911 recording seriously disrupted defense preparations for trial, which was to begin on August 14, 2013." App., Vol. II at 545-46. The district court in turn found that "[a] continuance of four to eight weeks would have cured the prejudice to [Yepa]'s ability to defend arising from the late disclosure of evidence connecting the 911 call to the homicide." Id. at 548. Absent other exceptional circumstances, these findings should have compelled a

---

[3] It is undisputed that the 911 recording was disclosed to the defense in June 2013 during the course of discovery.

8

determination that a continuance was the proper remedy for the government's delay in providing notice to Yepa.

But the district court purported to find another type of prejudice. Noting that Yepa "had been continuously confined without bail since December 29, 2011," id., the district court concluded that a continuance of the August 14, 2013 trial date "would have unfairly required [Yepa], who was being held without bail, to suffer an additional four to eight weeks of pretrial incarceration." Id. at 549-50.

The problem, however, is that this is not the type of "prejudice" contemplated by Wicker and its progeny. Wicker, as previously noted, directs us to focus on the prejudice caused to the defendant by the government's delay, and we have defined such prejudice in terms of "the defendant's ability to prepare or present its case." Golyansky, 291 F.3d at 1250. Wicker, in turn, asks us to determine if any such resulting prejudice can be cured by a continuance. The district court in this case turned the Wicker analysis on its head by asking whether the continuance itself would prejudice the defendant. In other words, the district court performed a "double" prejudice analysis: after concluding that the prejudice to Yepa caused by the government's delay in disclosure could be cured by a four to eight-week continuance, it in turn assessed whether such a continuance would prejudice Yepa. That approach finds no support in Wicker and, in my view, amounts to an abuse of discretion. See Koon v. United States, 518 U.S. 81, 100 (1996) (holding that "[a] district court by definition abuses its discretion when it makes an error of law.").

Even assuming, for purposes of argument, that this type of prejudice can be

9

considered under Wicker, the district court did not provide any specific explanation for why, given the particular circumstances of Yepa's case, the additional period of incarceration would have been "unfair" or prejudicial to Yepa. Although the district court's order excluding the 911 recording referred in passing to the constitutional right to a speedy trial and its intended purpose of preventing undue and oppressive pretrial incarceration, the district court did not conclude, nor did Yepa even assert, that a four to eight-week continuance would result in a violation of his speedy trial rights. And, after examining the record on appeal, I find nothing therein that would compel a conclusion that Yepa would have been unduly prejudiced by an additional four to eight-week period of pretrial confinement. The fact of Yepa's pretrial detention stems from the district court's repeated findings that Yepa represents a danger to the community. As a result, the district court has consistently refused, including during the pendency of the appeals in this matter, to release Yepa on bond or to a halfway house.[4] As for the length of Yepa's pretrial detention, Yepa himself bears significant responsibility. Just three months after his arrest, Yepa moved successfully to vacate and continue the original trial date of April

---

[4] For example, on December 5, 2013, while the government's first interlocutory appeal was pending, Yepa filed a motion for release from custody. The district court denied that motion in a written order issued on January 23, 2014. In that order, "[t]he district court found that '[t]he United States ha[d] not intentionally delayed trial of this case' and that 'the period between [Yepa's] arrest and the scheduled August 2013 trial' was reasonable." Aplt. Br. at 24 (quoting App., Vol. II at 333). The district court also found in that same order that, "[b]y the time this case comes to trial, Defendant will have been detained for a very small fraction of the term of imprisonment he faces if convicted of first degree murder or aggravated sexual abuse resulting in death." App., Vol. II at 332.

10

4, 2012, that was set by the district court. And shortly thereafter, on April 11, 2012, Yepa moved successfully to have the case declared complex.

I also agree with the government that the district court effectively, and improperly, "carved out an exception to the preference for a continuance for cases where the defendant is detained pending trial." Aplt. Br. at 23. More specifically, because "[t]he district court did not point to any facts specific to this case that would make the additional time in pretrial custody especially onerous or prejudicial," its "analysis essentially would foreclose a continuance in any case in which the defendant is detained pending trial, which is hardly a rare occurrence." Id. Surely that cannot be the result anticipated by Wicker.

In sum, the district court's conclusion that Yepa would suffer "unfair prejudice" from an additional four to eight weeks of pretrial incarceration is simply not supported by any evidence in the record or any Supreme Court or circuit precedent.

IV

*The "other concerns" cited by the district court*

In addition to the Wicker factors, the district court, in choosing to exclude the 911 recording, also gave consideration to what it characterized as "other concerns."

A

To begin with, the district court rejected the government's assertion that exclusion of the 911 recording would preclude a just adjudication of the case. In support, the district court asserted that the 911 recording "does not 'make or break' the United States'

11

case." App., Vol. II at 550. "Even without the 911 call," the district court stated, "the United States has a strong case, which includes the eyewitness testimony of Rodney Adams, the bloody condition of [Yepa's] person and home, and fingerprint, serological and DNA evidence." Id. (internal footnote omitted). Thus, the district court concluded, "[e]xclusion of the 911 recording w[ould] not preclude a just adjudication of this case." Id. (internal quotation marks omitted).

This conclusion, however, it at odds with the district court's own descriptions of the recording:

> The 911 recording is very disturbing and required the defense to devise a strategy for countering the emotional impact of the recording on the jury. Although the Court does not find the substance of the recording necessarily inconsistent with Defendant's theory that Rodney Adams murdered the victim [while Yepa was purportedly passed out and unconscious due to alcohol intoxication], the recording, if properly authenticated, would corroborate Rodney Adams' testimony that Defendant sexually assaulted the victim.

App., Vol. II at 546 (footnotes omitted).

> [The recording] corroborates Adams' statement that Defendant sexually assaulted the victim, requiring the defense to make the difficult argument that "Defendant may have raped the victim, but he did not commit the rape that resulted in her death."

Id. at 550.

In short, the 911 recording is not simply an additional piece of evidence that can be excluded without significant impact on this case. Rather, the 911 recording is, for lack of a better description, a "game-changing" piece of evidence that quite clearly impacts the defense that can be mounted by Yepa. According to what we know at this point, only

12

three people were present in Yepa's house at the time of the assault that led to the

victim's death: the victim, Yepa, and Rodney Adams.  The two survivors, Yepa and

Adams, each purportedly claim that the other was responsible for the victim's death.

Without question, admitting the 911 recording at trial will assist the jury in resolving

these claims.  In contrast, excluding the 911 recording amounts to a severe sanction and

threatens to undermine the just adjudication of the charges that are pending against Yepa.

B

The other "concern" discussed by the district court was the impact of a four to

eight-week continuance on the summoned jurors, the district court, and the visiting judge

who had planned to preside over the trial.  With respect to these impacts, the district court

stated, in full, as follows:

> As of Sunday, August 11, 2013, the jury had not yet been impanelled.
> However, the jurors had been summoned and would have made
> arrangements affecting work, childcare and transportation, among other
> matters.  As the Court knew, continuing the trial would render for naught
> these personal sacrifices by the jury panel.  As the Court observed in its
> Order of August 11, 2013, the Court and its staff had devoted many hours in
> preparing the case for trial beginning August 14, 2013, diverting court
> resources from other time-sensitive matters.  A continuance would have
> squandered the August 14, 2013 trial setting, [the visiting judge's]
> preparations for trying the case beginning on August 14, 2013, the Court's
> efforts to prepare the case for trial beginning on August 14, 2013, and the
> accommodations to their normal schedules made by the jurors.

App., Vol. II at 550-51.[5]

_____

[5] The "Order of August 11, 2013" referred to by the district court contains only one
sentence discussing the district court's preparations for trial: "The Court and its staff have
devoted many hours in preparing this case for trial on the August docket, hours that could
(continued...)

13

The problem, however, is that the district court's discussion is simply too vague and unconvincing to justify the severe sanction of exclusion. Turning first to the impact of a continuance on the summoned jurors, the district court, at best, engaged in educated speculation as to what advance preparations the summoned jurors may have made in order to appear in court on the scheduled trial date. And, even assuming the district court was correct in its speculation, I am not persuaded that such advance preparations can be equated with the sacrifices made by jurors who actually appear in court prepared to serve as jurors.[6] In other words, from the perspective of a potential juror, preparing to appear at a trial is a far cry from actually appearing at the trial: at a trial, jurors are actually away from their jobs, homes, and families and likely have incurred substantial costs (both monetary and otherwise) in doing so. The same simply cannot be said in a pretrial situation, such as occurred here. Indeed, the proposed four to eight-week continuance would have relieved, at least temporarily, the summoned jurors from actually incurring any costs or sacrifices associated with appearing in court.

Vagueness also plagues the district court's discussion of the preparations that its staff and the visiting judge engaged in, as well as, more importantly, its assertion that those preparations would be "squandered" by a continuance. To be sure, I have no doubt

---

[5](...continued)
have been devoted to other time-sensitive matters deserving the Court's immediate attention." Dist. Ct. Docket No. 121 at 5.

[6] In <u>Wicker</u>, for example, the district court's decision to exclude evidence (and our affirmance thereof) was driven, in part, by the fact that "the jury had already been selected and th[e] trial was ready to begin." 848 F.2d at 1061.

that the court, its staff and the visiting judge engaged in some type of preparatory work for trial, including, perhaps, resolving pretrial motions or preparing jury instructions. But I find it difficult to understand how this preparatory work would be "squandered" because of a continuance. Because the district court did not elaborate on what preparations had been made for trial and why those efforts would be lost if a continuance were granted, I am left to afford this no weight in assessing the district court's decision to exclude the 911 recording.

V

None of the <u>Wicker</u> factors point to exclusion as the proper sanction in this case. Nor do the so-called "other concerns" cited by the district court. In addition, the district court gave no consideration whatsoever to any lesser sanctions, as required by <u>Wicker</u>. Consequently, I conclude that the district court committed a clear error of judgment and exceeded the bounds of permissible choice in selecting total exclusion of the 911 recording as the proper sanction in this case. As a result, I would reverse the district court's order and remand with directions to admit the 911 recording at trial.